IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JOSEPH ROBINSON, et al.** | : | |
| | : | |
|    **Plaintiff,** | : | |
| **v.** | : | |
| | : | **C.A. No.:  PJM 07-CV-0150** |
| **MONTGOMERY COUNTY,** | : | |
| **MARYLAND, et. al.** | : | |
| | : | |
|    **Defendants.** | : | |
| | : | |

## PLAINTIFF JOSEPH ROBINSON'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff, Joseph Robinson, by and through counsel, Joseph Cammarata,

Allan M. Siegel and the law Firm of Chaikin, Sherman, Cammarata & Siegel, P.C., and pursuant

to the Federal Rules of Civil Procedure, submits this Memorandum in Opposition to Defendants'

Motion for Summary Judgment, and in furtherance thereof states as follows:

## TABLE OF CONTENTS

                                                                                        **Page**

I.      **INTRODUCTION** .................................................................................1

II.     **STATEMENT OF MATERIALS FACTS IN GENUINE DISPUTE**................4

III.    **PROCEDURAL BACKGROUND**......................................................8

IV.    **MEMORANDUM OF POINTS AND AUTHORITIES**................................9

        **A.**    **Legal Standard**........................................................................9

        **B.**    **Argument**...........................................................................11

                **1.**    **Defendant Mazzuca Used Excessive Force Against Plaintiff, In Violation of the Fourth Amendment, When He Pushed Plaintiff to the Concrete, Face First, With Enough Force to Break His Zygomatic Arch**................................................11

2.    Viewing the Evidence in a Light Most Favorable to the
      Plaintiff, All of the Defendant Officers Are Liable for the
      Fourth Amendment Violation..............................................19

3.    The Defendant Officers Are Not Entitled to Qualified
      Immunity Because Any Reasonable Officer Would
      Understand that the Force Used Against Plaintiff, Which
      Resulted in His Face Slamming Against Pavement, Violated
      the Plaintiff's Fourth Amendment Constitutional Right to
      be Free From Excessive Force...........................................21

4.    Defendant Patil Should be Held Liable for the Injury
      Inflicted by His Subordinate Officers, Because
      He Had Actual or Constructive Knowledge That His
      Subordinate Officers Were Not Following Proper Arresting
      Protocol, and His Failure to Supervise the Scene Resulted in
      Constitutional Injury to the Plaintiff...................................24

      a.    Sergeant Patil Had Actual Knowledge of Conduct
            That Posed Pervasive and Unreasonable Risk of
            Harm...............................................................24

      b.    Sergeant Patil's Failure to Act Amounted to
            Deliberate Indifference or Tacit Authorization of
            His Officers' Unconstitutional Conduct......................26

      c.    Sergeant Patil's Failure to Act Was a Proximate
            Cause of the Violation of Plaintiff Robinson's
            Constitutional Rights............................................28

      d.    Sergeant Patil Failed to Take Control of the
            Operation to Ensure That Plaintiff Was Not Subject
            to Any Constitutional Violations...............................29

5.    There is Evidence that Montgomery County Had a Custom
      of Allowing Police Officers to Violate Policies and Procedures
      Which Would Lead to Violations of Constitutional rights,
      Failed to Adequately Investigate or Discipline Officers for
      Excessive Use of Force, and Failed to Adequately Train Its
      Police Officers.......................................................30

a.    The SAT Team's Blatant and Unchecked Disregard for Well-Established Police Guidelines Amounted to a Custom of Using Excessive Force Which Montgomery County Officials Knew or Should Have Known About, And Therefore Acquiesced To......................................31

b.    Montgomery County's Failure to Investigate an Excessive Force Complaint Made Against Sergeant Patil Demonstrates the County's Deliberate Indifference Towards the Constitutional Rights of Citizens..........................................................34

c.    Montgomery County's Failure to Investigate in the Present Case Demonstrates the County's Deliberate Indifference Towards the Constitutional Rights of Citizens..........................................................37

d.    Montgomery County's Failure to Provide Adequate Training to Police Officers Amounted to Deliberate Indifference to the Constitutional Rights of Citizens......39

6.    State Constitution Violations Have Been Established Under the Maryland Declaration of Right....................................42

7.    Defendants' Motion to Dismiss the Assault and Battery Claims Should Be Denied Because The Officers Acted With Malice................................................................43

8.    Defendants Are Not Entitled to Judgment on Plaintiff's Claim of Intentional Infliction of Emotional Distress, Because as a Direct Result of their Reckless, Extreme and Outrageous Conduct, Plaintiff Was Caused to Suffer Emotional Distress....................................................44

9.    Plaintiff is Entitled to Punitive Damages, Because Defendants Acted With Malice .......................................46

IV.    CONCLUSION....................................................................46

## TABLE OF AUTHORITIES

Cases:                                                                          Page

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)...................................................9, 32

*Alexis v. McDonald's Restaurants of Mass., Inc.,* 67 F.3d 341 (1st Cir. 1995).....................23

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)..........................................9, 11

*Anderson v. Russell,* 247 F.3d 125 (4th Cir. 2001)...............................................14

*Anderson v. United States,* 417 U.S. 211 (1974)................................................37

*Baker v. Monroe Tp.,* 50 F.3d 1186 (3d Cir. 1995)..............................................29

*Barwick v. Celotex Corp.*, 736 F.2d 946 (4th Cir. 1984)...........................................9

*Beck v. City of Pittsburgh,* 89 F.3d 966 (3d Cir. 1996)...............................34, 35, 36

*Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)............28, 33

*Celotex Corp. v. Caltrett,* 477 U.S. 317 (1986)...................................................9

*City of Canton, Ohio v. Harris,* 489 U.S 378 (1989)...............................27, 28, 33, 39, 40

*Davis v. DiPino,* 121 Md. App. 28 (1998).........................................................42

*E.E.O.C. v. Clay Printing Co.,* 955 F.2d 936 (4th Cir. 1992).....................................10

*Elliott v. Kupferman,* 473 A.2d 960 (Md. Ct. Spec. App. 1984)..................................43

*Elliot v. Leavitt,* 99 F.3d 640 (4th Cir. 1996).................................................14, 18

*Febus-Rodriguez v. Betancourt-Lebron,* 14 F.3d 87 (1st Cir. 1985)...............................27

*Gadson v. State,* 341 Md. 1 (1995).............................................................42

*Graham v. Connor,* 490 U.S. 386 (1989) ........................................................12, 22

*Grandstaff v. City of Borger, Tex.,* 767 F.2d 161 (5th Cir. 1985), *cert denied*............20. 37, 39

*Greenidge v. Ruffin,* 927 F.2d 789 (4th Cir. 1991) ..............................................14

*Harris v. Jones,* 380 A.2d 611 (Md. 1977).......................................................44

iv

*Holland v. Washington Homes, Inc.,* 487 F.3d 208 (4th Cir. 2007)...................................10

*Howerton v. Fletcher*, 213 F.3d 171 (4th Cir. 2000)...................................................12

*Iko v. Shreve*, 535 F.3d 225 (4th Cir. 2008)...........................................................9

*Jones v. Buchanan,* 325 F.3d 520 (4th Cir. 2003)..........................................12, 13, 15, 16

*Jordan v. Jackson,* 15 F.3d 333 (4th Cir. 1994).......................................................39

*Kane v. Hargis,* 987 F.2d 1005 (4th Cir. 1993)..............................................12, 16, 23

*Lee v. Cline,* 384 Md. 245 (2004).....................................................................43

*Lytle v. Doyle,* 326 F.3d 463 (4th Cir. 2003).........................................................40

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)...............................9

*McCaskill v. Yankalus*, No. 06-1739, 2007 U.S. App. LEXIS 17956 (4th Cir. July 27, 2007)....19

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)................................................37

*McDowell v. Rogers,* 863 F.2d 1302 (6th Cir. 1988)....................................................23

*McLenagan v. Karnes,* 27 F.3d 1002 (4th Cir. 1994)....................................................14

*McNabola v. Chicago Transit Authority,* 10 F.3d 501 (7th Cir. 1993)...................................31

*McNeal v. Montgomery County,* 307 Fed. Appx. 766 (4th Cir. 2009)......................................44

*Md. Comm. for Fair Representation v. Tawes,* 180 A.2d 656 (Md. 1962)..................................42

*Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir. 1990)..............................................10

*Miltier v. Beorn,* 896 F.2d 848 (4th Cir. 1990).......................................................26

*Monell v. Dept. of Soc. Servs.,* 436 U.S. 658 (1978)..................................................30

*Neiswonger v. Hennesey,* 89 F.Supp. 2d 766 (N.D. W.Va 2000)...........................................17

*Owen v. City of Independence, Mo.,* 445 U.S. 622 (1980)...............................................35

*Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986)...................................................35

*Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464 (1962)....................................9

*Pressly v. Gregory*, 831 F.2d 514 (4th Cir. 1987)……………………………………12

*Rizzo v. Goode*, 423 U.S. 362 (1976)……………………………………………….28

*Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir. 1985)………………9, 11

*Rowland  v. Perry*, 41 F.3d 167 (4th Cir. 1994)………………………………12, 16, 21

*Saucier v. Katz*, 533 U.S. 194, 200 (2001)………………………………………….21

*Scott v. Harris*, 550 U.S. 372 (2007)………………………………………………...9

*Scott v. Jenkins*, 345 Md. 21 (1997)……………………………………..………….46

*Shaw v. Shroud*, 13 F.3d 791 (4th Cir. 1994)……………………………………...24, 28

*Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984)…………………………………24, 26, 28

*Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) ……………………………………14

*Southern Holdings v. Horry County*, 2007 U.S.Dist. LEXIS 25021 \*\*19-20 (D.S.C. 2007)…...41

*Spell v. Daniel*, 824 F.2d 1380 (4th Cir. 1987)……………………………………30, 34, 40

*Thacker v. City of Hyattsville*, 135 Md. App. 268 (2000)…………………...…………..43

*Thompson v. City of Los Angeles*, 885 F.2d 1439 (9th Cir. 1989)……………………….30

*United States v. Diebold*, 369 U.S. 654 (1962)……………………………...…………..9

*Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995)……………………..……………34

*Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977)……………………………………26

*Wellington v. Daniels*, 717 F.2d 932 (4th Cir. 1983)……………………………………28

*Williams v. Prince George's County*, 112 Md. App. 526 (1996)……………………....16, 42

*Williams v. Washington Metropolitan Area Transit Authority*, 721 F.2d 1412 (1983) …………10

*Withers v. Levine*, 615 F.2d 158 (4th Cir. 1980)……………………………………26

Exhibit List

| Exhibit No. | Exhibit |
|---|---|
| 1 | Deposition of Robert Mazzuca |
| 2 | Deposition of Daniel Fried, D.D.S. |
| 3 | Deposition of Barry Cohan, D.D.S. |
| 4 | Deposition of Samuel Wichner |
| 5 | Deposition of Joseph Robinson |
| 6 | Deposition of Charles Haak |
| 7 | Neuropsychological Evaluation |
| 8 | Deposition of David Wells |
| 9 | Deposition of Dinesh Patil |
| 10 | Deposition of Shanda Berry |
| 11 | Deposition of Melanie Eberley |
| 12 | Letter from Captain Douglas McKee |
| 13 | Maggie Bauer Sworn Statement |
| 14 | Notes - Eberley Interviews of Bauers |
| 15 | E-mail re: Freeman Statement |
| 16 | Deposition of John Peters, Ph.D. |
| 17 | Depo. of P. Steven Macedo, M.D. |
| 18 | Depo. of Alan Schwartzberg, M.D. |
| 19 | Deposition of Estelle Davis, Ph.D. |
| 20 | Handcuffing Prone Position |
| 21 | Use of Force Directive |
| 22 | Deposition of John Cunningham |
| 23 | Incident Offense Report |
| 24 | Montg. Cty. Fire and Rescue Report |
| 25 | Notice Letter to Montg. Cty. |
| 26 | John Peters, Ph.D. report |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **JOSEPH ROBINSON, et al.** : | |
| : | |
| **Plaintiff,** : | |
| **v.** : | |
| : | C.A. No.: PJM 07-CV-0150 |
| **MONTGOMERY COUNTY,** : | |
| **MARYLAND, et. al.** : | |
| : | |
| **Defendants.** : | |
| : | |

## PLAINTIFF JOSEPH ROBINSON'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff, Joseph Robinson, by and through counsel, Joseph Cammarata, Allan M. Siegel and the law Firm of Chaikin, Sherman, Cammarata & Siegel, P.C., and hereby opposes Defendants' Motion for Summary Judgment. Summary judgment is clearly inappropriate as there are genuine disputes of material facts, and Defendant is not entitled to judgment as a matter of law.

## I.     INTRODUCTION

On March 28, 2006, Plaintiff Joseph Robinson was driving his vehicle northbound on Hungerford Drive when his vehicle was surrounded by unmarked Montgomery County police vehicles. One of these vehicles suddenly and without warning forcefully applied its brakes, and swerved directly into the path of Plaintiff's forward moving vehicle, causing the two vehicles to collide. The Montgomery County police officers then exited their unmarked police cars with their guns drawn and ordered Plaintiff to exit his vehicle. As set forth in more detail below, Plaintiff's version of the events, which must be accepted for purposes of ruling on a summary judgment motion, establishes that Plaintiff followed all the officers' commands, and **was handcuffed** when he was slammed to the ground with enough force to break his zygomatic arch.

(also commonly referred to as the cheekbone). It is undisputed that Officer Robert Mazzuca admits that he is the officer that "pushed" the Plaintiff down to the ground (*See Exhibit 1*, Mazzuca Dep. at 43:14 – 44:12).[1] It is also undisputed that whatever the level of force exerted by Officer Mazzuca it was enough to fracture Plaintiff Joseph Robinson's zygomatic arch (*See Exhibit 2*, Fried Dep. at 9:18-10:1; 13:8-20; *Exhibit 3*, Cohan Dep. at 48:4-12).

      The clearest evidence that summary judgment must be denied is Defendants' Statement of "Undisputed" Facts which on its face sets forth **disputed** facts. In fact, everything that happened from the moment that Plaintiff exited his vehicle, until the time that he found himself lying face down on the concrete, are seriously in dispute and preclude summary judgment. For example, as set forth in Defendant's Statement of "Undisputed" Facts Plaintiff claims that he was compliant with all commands given by the officers, including instructions given to him to back up and place his hands behind his back at waist level, and that he was handcuffed prior to being taken down to the concrete. (*See* Defendants' Statement of Material Facts Not in Dispute, pp. 7-8). Thus, the very facts that Defendants rely upon to claim that Officer Mazzuca's use of force was reasonable (*i.e.* that Plaintiff was not compliant which justified use of force, and that the officers needed to put Plaintiff on the ground to get him handcuffed) are in fact disputed. Indeed, Defendant's own liability expert, Samuel Wichner agrees that if the facts are viewed in a light most favorable to the Plaintiff (*i.e.* Plaintiff was handcuffed at the time he was pushed by Officer Mazzuca) that the force used to put Plaintiff on the ground was in fact excessive:

---

[1] All citations to depositions reference page numbers followed by line numbers (*i.e.* page number: line number).

**Q:**  Now, if you were to be told, as this Exhibit 06, the, what we'll call, the contemporaneous Robinson version says, that Mr. Robinson was handcuffed and then pushed onto the ground -- and I want you to assume that that was what happened.

**A:**  Okay.

**Q:**  Would you agree with me that that use of force would be excessive, unjustified use of deadly force?

**A:**  In a hypothetical situation as what you've laid out, had he been handcuffed while he was either standing or kneeling and then slammed into the ground, I would say that that would be an excessive use of force.

(*See Exhibit 4*, Wichner Dep. at 175:7-20).

Moreover, discovery revealed that Defendant Montgomery County failed to correct known violations of established police protocol and procedures, failed to adequately investigate complaints against police officers for use of excessive force, and failed to adequately supervise its officers to ensure that they were using proper techniques to get a suspect handcuffed and under control.   Indeed, the facts viewed in a light most favorable to the Plaintiff demonstrate that had the Defendant officers been properly trained and supervised regarding handcuffing techniques and protocol, and had a similar incident involving superior officer, Sergeant Dinesh Patil been properly investigated, that the Defendant officers would have known not to push a suspect, face first into concrete, since that behavior is likely to cause serious bodily injury or death. Clearly, the issue of whether the county's inaction contributed to the violation of the Plaintiff's constitutional rights is a question of fact for the jury.

Accordingly, summary judgment must be denied. As further reasons therefore, Plaintiff submits the following Statement of Material Facts in Dispute and Memorandum of Points and Authorities.

3

## II.    STATEMENT OF MATERIAL FACTS IN GENUINE DISPUTE

Plaintiff, pursuant Fed. R. Proc. Civ. 56 hereby submits this Statement of Material Facts in Genuine Dispute:

1.    Plaintiff complied with all of the officers' orders during the incident in question. (*See Exhibit 5*, Robinson Dep. at 120:12-13; 121:4-15; 126:19-127:4); *Exhibit 1*, Mazzuca Dep. at 93:15-94:5). Upon being stopped and surrounded by police vehicles, Plaintiff was ordered to put his hands up in the air, and he did so. (*See Exhibit 5,* Robinson Dep. at 113:19-23). He was then ordered to exit from the passenger side door, and upon exiting, was told to turn around and walk backwards towards the officer, one foot at a time, with his hands kept in the air. (*See Exhibit 5,* Robinson Dep. at 114:9-115:14).

2.    Plaintiff without question began to walk backwards towards the officer. (*See Exhibit 5*, Robinson Dep. at 115:5-14; 121:10-12).

3.    While walking, Plaintiff turned his head to try to get a better view of where the police were. While doing so, he did not slow down or stop walking. However, an officer told him "don't look back at him or he would blow [Plaintiff's] "f*****g head off." (*See Exhibit 5*, Robinson Dep. at 115:5-14).

4.    Plaintiff did not respond to this statement of violence, but rather continued to walk backwards towards the officer. (*See Exhibit 5*, Robinson Dep. at 116:9-14). Once he had reached the officer, Plaintiff was ordered to put his hands behind his back, at which time he was handcuffed. (*See Exhibit 5*, Robinson Dep. at 116:13-14).

5.    Plaintiff was not verbally hostile towards the officers at any point during the incident. (*See Exhibit 5*, Robinson Dep. at 129:14-15).

6.    Defendants did not ask Plaintiff to get on his knees (*See Exhibit 5*, Robinson Dep. at 120:23-25), but instead forcibly buckled his knees in an attempt to make Plaintiff collapse to the ground. (*See Exhibit 5*, Robinson Dep. at 116:9-15).

7.    At no point did Plaintiff present a threat to the safety of the officers involved. Plaintiff was unarmed and was under the complete control of the officers, who were surrounding the Plaintiff and had their guns drawn and pointed directly at him. (*See Exhibit 5*, Robinson Dep. at 127:22-128:16; and *Exhibit 6*, Haak Dep. at 109:18-21).

8.    Plaintiff did not make any comments to the police officers while they issued orders. In particular, he did not, as Defendants allege, complain that "the ground is wet" when told to get on the ground. (*See Exhibit 5*, Robinson Dep. at 121:4-12). In fact, Defendants, at no time, verbally ordered the Plaintiff to get down onto the ground, prior to forcibly putting him on the ground. (*See Exhibit 5*, Robinson Dep. at 120:23-121:3).

9.    Plaintiff was forcibly picked up by the Defendant officers and slammed head first into the ground. (*See Exhibit 5*, Robinson Dep. at 116:9-20).

10.   Plaintiff was already handcuffed when he was thrown to the ground (*See Exhibit 5*, Robinson Dep. at 116:9-20).

11.   Officer Mazzuca admits that he was the officer that pushed Plaintiff to the ground. (*See Exhibit 1*, Mazzuca Dep. at 43:14-44:12). While Officer Mazzuca describes the force exerted as moderate, Defendant Mazzuca pushed Plaintiff to the ground with enough force to cause his head to slam against the pavement resulting in a fracture to his left zygomatic arch. In fact, Defendants' experts agree that Plaintiff's fractured zygomatic arch was the result of being pushed to the ground during the incident, and that Plaintiff's zygomatic arch fracture was not caused by the oral surgery he had undergone prior to the incident. (*See Exhibit 2*, Fried Dep. at

5

9:18-10:1; 13:4-20; 25:4-26:3; *Exhibit 3*, Cohan Dep. at 48:4-12). In addition, the level of force used resulted in a head injury causing cognitive deficits. (*See Exhibit 7,* Neuropsychological Evaluation).

12.    Even assuming the truth of Defendants' version of events, where Plaintiff was pushed to the ground from a kneeling position, Plaintiff was not a flight risk, since he was already on his knees. (*See Exhibit 8*, Wells Dep. at 76:8-11; 77:9-12).

13.    Pushing someone who has been compliant and is already handcuffed is inappropriate and contrary to Montgomery County policy. (*See Exhibit 9*, Patil Dep. at 108:3-17; 113:4-8).

14.    Montgomery County specifically teaches that pushing is not an appropriate method for putting a suspect onto the ground, because it is not the safest method for accomplishing that task. (*See Exhibit 10*, Berry Dep. at 72:14-73:22).

15.    The Defendants were all members of a Special Assignment Team ("SAT"). SAT officers rarely, if ever, followed the established safe prone handcuffing protocols (*See Exhibit 1*, Mazzuca Dep. at 86:2-89:2), and Sergeant Patil did not strictly follow those guidelines when teaching his officers how to prone a suspect. (*See Exhibit 9*, Patil Dep. at 46:12-49:3).

16.    Sergeant Patil had actual or constructive knowledge that his SAT officers were not complying with Montgomery County protocol regarding prone handcuffing practices. (*See Exhibit 9*, Patil Dep. at 46:12-49:3).

17.    Sergeant Patil, the supervisor of the officers, who was involved in the operation, did not take control of the situation on the night in question. He instead let his officers "handle the takedown." (*See Exhibit 9,* Patil Dep. at 140:13-14).

6

18.    Montgomery County has a widespread practice of allowing police officers to disregard established police department rules and regulations. (*See Exhibit 1*, Mazzuca Dep. at 86:2-89:2).

19.    Montgomery County failed to adequately investigate a prior complaint of excessive force asserted against Sergeant Patil. It ignored a statement made by an independent witness, and focused only on an allegation of excessive police presence, instead of the more troubling issue of excessive force. (*See Exhibit 11,* Eberley Dep. at 59:10-60:6; 149:4-9; 150:4-16; and *Exhibit 12,* Letter from Captain Douglas McFee, Director of Internal Affairs Division, to Mr. & Mrs. Karl Bauer; *Exhibit 13*, Maggie Bauer sworn statement; *Exhibit 14*, Notes from Eberley interviews of Bauers; *Exhibit 15*, e-mail re: Freeman statement).

20.    Montgomery County training for prone handcuffing is inadequate. (*See Exhibit 16,* Peters Dep. at 57:13-61:23). There is no objective testing criteria in place for testing the officers on these skills, and officers are not taught how to adapt situations where a suspect may not have full possession of his facilities, or what the possible consequences of deviating from the training guides may include. (*See Exhibit 16,* Peters Dep. at 78:24-82:6).

21.    As a direct result of Defendants' excessive use of force, Plaintiff suffered, among other things, a fracture of his zygomatic arch, and a brain injury, which has resulted in permanent cognitive deficits. (*See Exhibit 2*, Fried Dep. at 9:18-10:1; 13:8-20; 25:4-29:21; *Exhibit 3*, Cohan Dep. at 47:9-16; 48:4-12; and *Exhibit 17*, Macedo Dep. at 13:21-14:9; 102:9-19; 104:7-105:12; 126:12-128:14). In addition, since the incident Plaintiff has suffered paranoid delusions of being followed by police officers (*See Exhibit 1,* Robinson Dep. at 232:1-233:21; 236:9-237:11; 135:10-136:21), as well as nightmares and recurrent, distressing flashbacks to the incident. (*See Exhibit 18,* Schwartzberg Dep. at 84:5-10). He is also plagued by headaches, confusion, memory

7

loss, depression, and a sleeping disorder. (*See Exhibit 1,* Robinson Dep. at 270:14-18; and

*Exhibit 17,* Macedo Dep. at 87:6; 110:16-18; 117:3-8; 118:11-20). As a result of these

conditions, Plaintiff is no longer able to mentally keep up with the tasks required for his job as an

electrical technician at the Washington Metropolitan Transit Authority, and is unemployable in

the work force. (*See Exhibit 1,* Robinson Dep. at 266:18-19; 270:7-12; 277:1-14; and

*Exhibit 19*, Estelle Davis, Ph.D. Dep. at 70:12-78:21).

### III.    PROCEDURAL BACKGROUND

On January 16, 2007 Plaintiff filed suit against Montgomery County, Chief of Police J.

Thomas Manger, in his official capacity, and Police Officers Dinesh Patil, Charles Haak, Alan

Cawood, David Wells, and Robert Mazzuca. Plaintiff subsequently withdrew certain counts, by

stipulation. At this time, based on the stipulation the following claims remain at issue.

a.    Count I – Assault and Battery against Defendants Patil, Haak, Cawood, Mazzuca and Wells.

b.    Count II – Intentional Infliction of Emotional Distress against Defendants Patil, Haak, Cawood, Mazzuca and Wells.

c.    Count III – False Imprisonment against Defendants Patil, Haak, Cawood, Mazzuca and Wells.

d.    Count IV – Negligence against Defendants Patil, Haak, Cawood, Mazzuca and Wells.

e.    Count VI – 42 U.S.C. section 1983, Fourth Amendment claims against Defendant Montgomery County, Chief Manger, in his official capacity, and Defendants Patil, Haak, Cawood, Mazzuca and Wells.

f.    Count VII – Maryland Declaration of Rights, Articles 2, 24 and 26 claims against Defendant Montgomery County, Chief Manger, in his official capacity, and Defendants Patil, Haak, Cawood, Mazzuca and Wells.

g.    Count VIII – Punitive Damage claims against the individual police officers.[2]

---

[2] Plaintiffs made claims for Loss of Consortium (Count IX) and Property Damage (Count X) which are not at issue in Defendants' motion.

Based on the information received and developed in discovery Plaintiff will file a

Praecipe of Dismissal regarding Counts III and IV.  Accordingly, the issues that remain at issue

in this motion are Counts I, II, VI, VII, and VIII.


### IV.    MEMORANDUM OF POINTS AND AUTHORITIES

#### A.    LEGAL STANDARD

Summary judgment may be granted only when "there is no genuine issue as to any

material fact" and it is clear that "the [moving party] is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c). A genuine issue exists where "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242

(1986).  The moving party, in this case, Defendants, bears the burden of "demonstrat[ing] the

absence of any genuine issue of material fact." *See Barwick v. Celotex Corp.,* 736 F.2d 946 (4th

Cir. 1984); *Ross v. Communications Satellite Corp.,* 759 F.2d 355 (4th Cir. 1985); *Adickes v.

S.H. Kress & Co.,* 398 U.S. 144, 157 (1970).

In ruling on a motion for summary judgment, the court must view the evidence in the

light most favorable to the parties opposing the motion - in this case, Plaintiff Robinson. *See

Scott v. Harris*, 550 U.S. 372 (2007); *Celotex Corp. v. Caltrett*, 477 U.S. 317, 325 (1986);

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All inferences that

may be drawn from the underlying facts are to be viewed in the light most favorable to the

Plaintiff, as the nonmoving party. *Iko v. Shreve,* 535 F.3d 225 (4th Cir. 2008); *United States v.

Diebold,* 369 U.S. 654, 655 (1962); *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464

(1962).

9

Plaintiff, as the nonmoving party, is entitled to have the credibility of his evidence presumed, and his version of all that is in dispute accepted. *Ross,* 759 F.2d at 364, *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir. 1990). Any conflicts or doubt as to the existence of a factual dispute must be resolved against Defendants. *Ross,* 759 F.2d at 364. Such doubt is sufficient to preclude summary judgment, because the court may not resolve issues of fact or weigh evidence at the summary judgment stage. *E.E.O.C. v. Clay Printing Co.,* 955 F.2d 936, 949 (4th Cir. 1992). **"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . "** *Holland v. Washington Homes, Inc.,* 487 F.3d 208, 223 (4th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). (emphasis added)  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Anderson,* 477 U.S. at 255.

The court must draw all inferences from the record in the light most favorable to the party opposing the motion. *Williams v. Washington Metropolitan Area Transit Authority,* 721 F.2d 1412, 1414-1415 (1983). (emphasis added)  Indeed, "the record must show the movant's right to [summary judgment] 'with such clarity as to leave no room for controversy,' and must demonstrate that his opponent 'would not be entitled to [prevail] under any discernible circumstances;.'" *Id.* at 1415 (citations omitted)  Summary judgment is unavailable if it depends upon any fact that the record leaves susceptible of dispute. *Id. at 1415.*

In the case at hand, Defendants attempt to argue that since Plaintiff cannot identify his assailants, that the Court cannot accept any portion of his version of events.  Defendants must take this position because they realize that their own experts have conceded that the facts alleged by the Plaintiff establish constitutional violations by the officers. *See argument, infra.*  However,

the law is clear that Plaintiff is entitled to have all inferences from the **entire record** viewed in a light most favorable to the Plaintiff. Indeed, the Maryland Pattern Jury Instructions provide that a jury when assessing the credibility of witness may believe "all, part or none of the testimony of any witness." Maryland Pattern Jury Instruction, Civil 1:3. Plaintiff is entitled to all favorable inferences regarding all facts regardless of their source. Clearly, the Plaintiff is not limited to the facts within his knowledge. The fact finder in this case may choose to believe some, but not all of the facts on the record testified to by the police officers, and some but not all of the facts on the record testified to by the Plaintiff. However, in deciding a motion for summary judgment, all the facts which support the Plaintiff's point of view must be accepted as true, and all reasonable inferences, regardless of the source, must be viewed in a light most favorable to the Plaintiff.

## B.    <u>ARGUMENT</u>

1.    **Defendant Mazzuca used excessive force against Plaintiff, in violation of the Fourth Amendment, when he pushed Plaintiff to the concrete, face first, with enough force to break his zygomatic arch.**

Defendant Mazzuca admits that he "pushed" the Plaintiff to the ground *(See Exhibit 1,* Mazzuca Dep. at 43:14 – 44:12). Thus, Defendant's attempt to argue that Plaintiff is unable to attribute any specific conduct to any particular officer is incorrect. Thus, the issue is whether Officer Mazzuca's admitted actions violated Plaintiff's constitutional rights. When the facts are viewed in a light most favorable to the Plaintiff (i.e. Plaintiff was handcuffed when he was pushed) it is clear that whether Plaintiff's Fourth Amendment rights were violated is an issue for the jury. Indeed, as more fully set forth below, even if the Defendant's accounts are accepted as true, whether Defendant Mazzuca acted "objectively reasonable" under the circumstances is an issue for the jury.

The Fourth Amendment states in relevant part:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. *U.S. Const. amend. IV.*

"The Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen." *Jones v. Buchanan,* 325 F.3d 520, 527 (4th Cir. 2003) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). In determining whether force used to affect particular seizure is "reasonable" under the Fourth Amendment, the question is whether officers' actions are "objectively reasonable" in light of facts and circumstances confronting them without regard to their underlying intent or motivation. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Factors looked at in determining the objective reasonableness of a police officer's use of force include: (1) severity of crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham,* 490 U.S. at 396. The extent of the plaintiff's injury resulting from the officer's use of force is also a relevant consideration. *Jones,* 325 F.3d at 527, citing *Rowland v. Perry,* 41 F.3d 167, 174 (4th Cir. 1994); *Kane v. Hargis,* 987 F.2d 1005, 1008 (4th Cir. 1993); and *Pressly v. Gregory,* 831 F.2d 514, 517 (4th Cir.1987). "The question that must be resolved, therefore, is whether it was objectively reasonable to use the force that was used in order to affect that individual's seizure." *Howerton v. Fletcher*, 213 F.3d 171, 173 (4th Cir. 2000).

When applying these factors to the facts in a summary judgment motion, the facts must be viewed in a light most favorable to the Plaintiff. Accordingly, in making this determination, the Court must assume that Plaintiff complied with all commands, and was already handcuffed at

the time of the alleged excessive force. *See Jones*, 325 F.3d at 526 (noting that the magistrate

judge offered no explanation for improperly failing to credit Jones's testimony that he was

handcuffed and posed no threat to anyone at the time of the use of excessive force).

Applying the Graham factors to the case at hand, it is clear that this case must go to the

jury on the Fourth Amendment claims. First, while the police believed Plaintiff was driving a

stolen vehicle, (a felony) there is no evidence, **under either version of facts**, that Plaintiff posed

an immediate threat to the safety of officers or others, or that Plaintiff was actively resisting

arrest or attempting to evade arrest by flight. Accordingly, factors two and three weigh strongly

in favor of the Plaintiff. In particular, in evaluating factor two whether Plaintiff posed an

immediate threat to the safety of the officers or others, under Plaintiff's version, he obeyed every

command given to him, including putting his hands behind his back, and being handcuffed. (*See

Exhibit 5*, Robinson Dep. at 120:10-13; 121:4-15; 126:19-24; 126:25-127:5; 129:14-15).

Defendant Haak admits that Plaintiff never made any furtive gestures or attempt to reach for any

suspicious objects and was not aggressive. (*See Exhibit 6*, Haak Dep. at 135:22-137:3). Experts

for both parties agree that pushing someone who has been compliant and is already handcuffed is

unnecessary, and is an excessive use of force. (*See Exhibit 16*, Peters Dep. at 118:18-22; and

*Exhibit 4*, Wichner Dep. at 175:7-20). Defendant Patil himself admits that this type of behavior

is not only inappropriate, but also contrary to Montgomery County policy. (*See Exhibit 9*, Patil

Dep. at 108:3-17; 113:4-8). Clearly, the handcuffed compliant Plaintiff did not pose a threat to

the safety of the Defendants or others.

As it relates to factor three, there is no evidence that he was actively resisting arrest or

attempting to evade arrest by flight. Indeed, even under the Defendant's version of events,

Plaintiff was not verbally hostile, and did not make any attempts to struggle with officers during

his arrest. (*See Exhibit 1*, Mazzuca Dep. at 91:8-10; 93:15-94:5; and *Exhibit 6*, Haak Dep. at 135:22-137:3). Plaintiff obeyed the commands given to him by Defendant Haak -- stepping out of the passenger side of his vehicle, putting his hands in the air, turning around and backing up towards Defendant Haak, stopping when he has reached Defendant Haak, and getting down on his knees. (*See Exhibit 6*, Haak Dep. at 127:9-134:10). While according to the Defendants Plaintiff did not immediately lie down on the ground, instead responding to the officers that the ground was wet, Plaintiff **was already on his knees**, and therefore did not pose a flight risk. Thus, a reasonable officer could not have believed that Plaintiff posed a flight risk or any imminent threat to the safety of the officer or others.

The facts in this case differ significantly from those in the cases cited by Defendants, in which courts have held that an officer could reasonably perceive the plaintiff posed an immediate threat to his safety or that of others. *See Elliott v. Leavitt,* 99 F.3d 640, 642 (4th Cir. 1996) (suspect "pointed" handgun at officers "with his finger on the trigger" and did not comply with officer's order to drop the gun); *McLenagan v. Karnes,* 27 F.3d 1002, 1007 (4th Cir.1994) (although officer knew suspect was "handcuffed in front," he "reasonably believed" that another officer saw gun in plaintiff's hands, and "could not confirm" that plaintiff was unarmed); *Greenidge v. Ruffin,* 927 F.2d 789, 790 (4th Cir. 1991) (officer reasonably believed that suspect was reaching for a shotgun); *Slattery v. Rizzo,* 939 F.2d 213, 215-16 (4th Cir. 1991) (holding that deadly force was appropriate when the suspect failed to comply with the officer's order to raise his hands and the officer reasonably believed the suspect to be coming at him with a weapon, although the "weapon" turned out to be a beer bottle); *Anderson v. Russell,* 247 F.3d 125, 130 (4th Cir. 2001) ("evidence conclusively establish[ed]" that officer "reasonably perceived" suspect "to be armed with a gun").

14

Indeed, the case at hand is analogous to *Jones, supra,* where a detainee alleged he was handcuffed when he was knocked to the floor by officers, causing his nose to break.  In that case the 4th Circuit found that courts have consistently held that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen do not act in an objectively reasonable manner." *Jones*, 325 F.3d at 532.   In that case Jones conceded that he was drunk, angry and using foul language- **factors that do not exist in the case at hand.**  The case was similar to the case at hand in that Jones was handcuffed when he was knocked to the floor and jumped on by a police officer which resulted in him suffering a broken nose, a lacerated face and bruised ribs.   There, the court held that given the fact that at the time of the incident the Jones' hands were handcuffed behind his back, he could not have posed an immediate threat to anyone, and therefore there was no "legitimate law enforcement need" for the force used. *Id.* at 529-530.  The defendant was therefore not entitled to use unnecessary, gratuitous, and disproportionate force against a handcuffed, secured citizen, who posed no threat to the deputy or others. *Id.*  The present case is similar to *Jones* in that the facts viewed in a light most favorable to the Plaintiff demonstrate that he was forcefully pushed to the ground while he was handcuffed and entirely under the control of the arresting officers. (*See Exhibit 5*, Robinson Dep. at 116:9-14).  He did not verbally or physically struggle with officers, and complied with all orders given. (*See Exhibit 5*, Robinson Dep. at 120:10-13; 121:4-15; 126:9-24; 126:25-127:5 and 129:14-15; *Exhibit 1,* Mazzuca Dep. at 93:15-17; and *Exhibit 6,* Haak Dep. at 135:22-137:3).  Thus, viewing the facts in a light most favorable to the Plaintiff, it is clear that no reasonable officer would have believed that the use of force used by Defendant Mazzuca was objectively reasonable.

The fourth factor - the extent of the Plaintiff's injuries resulting from the officer's use of force – also weighs heavily in favor of Plaintiff's excessive force claim. *See Rowland*, 41 F.3d at 174 (upholding denial of summary judgment to officer in excessive force case in which the officer inflicted "serious leg injury" on a misdemeanor); *Kane,* 987 F.2d at 1008 (per curiam) (upholding denial of summary judgment when officer cracked three teeth, cut suspect's nose, and inflicted facial bruises); *Jones,* 325 F.3d at 530-531 (finding excessive force used where officer crushed detainee's nose, caused lacerations to detainee's nose and lips, and bruised detainee's ribs). In the case at hand, Plaintiff's zygomatic arch was fractured as a result of the force used. Defendant's experts in this case agree that the fractured zygomatic arch was caused by the incident at issue. (*See Exhibit 2*, Fried Dep. at 9:18-10:1; *Exhibit 3*, Cohan Dep. at 48:4-12). Clearly the amount of force needed to break a cheek bone is significant. Therefore, the nature of Plaintiff's injury is further evidence of excessive force in violation of the Fourth Amendment, which precludes summary judgment.

The case at hand is also clearly distinguishable from the cases cited by Defendant to support its argument that its officers' use of force in this case was reasonable. With respect to *Williams v. Prince George's County,* 112 Md.App. 526, 685 A.2d 884 (1996), while that case also involved a stolen vehicle, the Plaintiff in that case suffered no **physical injury.** By the suspect's own account,  the arresting officers ordered him out of the car, told him to get on his hands and knees with his hands behind his back, then put a knee on his back, held his shoulder, and **eased him down** to the ground. *Id.* at 535. They "didn't rough [him] up or anything." *Id.* Additionally, it was only after the suspect in *Williams* had been lowered to the ground that the arresting officers handcuffed him. *Id.* As a result, he came away from the arrest with no physical injuries, no scratches or bruises on his body. *Id.* at 534, 536. This is in marked contrast to the

16

present case, where Plaintiff was already handcuffed and the force used to get him to the ground was significant enough to not only fracture Plaintiff's cheekbone but also to cause him to suffer a brain injury, which has resulted in permanent cognitive deficits. In light of the significant and crucial differences between the conduct of the officers in *Williams* and that of officers in the present case, and the Plaintiff's injuries in this case, Defendants cannot reasonably argue that minor factual similarities between the two cases justify a finding that their conduct was objectively reasonable under the circumstances.

Similarly, *Neiswonger v. Hennesey*, 9 F.Supp.2d 766 (N.D. W.Va. 2000) which Defendants cite as a case with "significant similarities" to the instant case, may also be distinguished from the current case. In *Neiswonger,* officers responding to a burglar alarm had legitimate reason to believe that a threat existed which justified use of force. Prior to taking the suspect down to the ground, the arresting officers in *Neiswonger* had been unable to ascertain whether the suspect was a burglar – all they could see was a man "dressed inappropriately, loading items into a vehicle outside a residence where a burglar alarm was sounding, with what appeared to be blood on his clothing." *Id.* at 773. Additionally, at the time that the suspect in that case was pushed to the ground, the defendant officer was not actually attempting to arrest him, but protecting him from potential gunfire from another officer who had drawn his weapon when he spotted movement inside the house that he thought was the suspect's accomplice reaching for a weapon. *Id.*at 769. Defendants are correct that the mere fact that the plaintiff in *Neiswonger* came away with a broken bone did not establish that excessive force was used. Looking at the totality of the circumstances – which included the suspect wearing a blood-stained shirt, the suspect's suspicious appearance and behavior outside a house with a burglar alarm sounding, and the possibility of an armed accomplice inside the house – the Court found

17

that any reasonable police officer would have perceived a threat and acted as the defendant

officer in that case did. However, none of these exigencies existed in the instant case. Here,

there was no threat, perceived or otherwise. At no point did Plaintiff make any threatening

furtive gestures, or attempt to reach for any suspicious objects. (*See Exhibit 6*, Haak Dep. at

135:22-137:3). The Plaintiff in the case at hand was unarmed, non-aggressive and non-hostile,

completely compliant with Defendants' orders, and surrounded at all times by multiple officers,

all of whom had their guns trained on his body. Additionally, at the time that Defendant Mazzuca

pushed Plaintiff to the ground, Plaintiff was already handcuffed. No reasonable officer could

have believed that there was legitimate law enforcement need for the amount of force applied to

the already handcuffed Plaintiff in that situation.

Likewise, the decision in *Elliot v. Leavitt* should not affect the outcome in the instant

case. In *Elliot,* the suspect was sitting in the back of the police vehicle, at close range to the

officers, pointing a gun at them with his finger on the trigger. *Elliot v. Leavitt,* 99 F.3d 640 (4th

Cir. 1996). Officers only discharged their weapons after he refused to drop the handgun when

ordered to do so. *Id.* There, the police officers' use of deadly force was found to be reasonable

and justified because the officers were confronted with an "obvious, serious, and immediate

threat to their safety," and the Constitution "does not require police to gamble with their lives in

the face of a serious threat of harm." *Id.* at 641. However, no such threat existed in the present

case. As previously mentioned, the Plaintiff in this case was unarmed, compliant, non-hostile,

and completely under the control of the armed police officers. At no point did Plaintiff make a

threatening gesture or reach for suspicious objects, much less point a weapon directly at the

officers. Defendants were therefore not confronted with any "obvious, serious and immediate

threat" to their safety which could justify their excessive use of force.

In *McCaskill v. Yankalus,* No. 06-1739, 2007 U.S. App. LEXIS 17956 (4th Cir. 2007),

the suspect failed to comply with officers' repeated orders to "get down", and officers were

unsure whether there were other, armed individuals in the house. The court held that pushing the

plaintiff down **onto a mattress** was reasonable under the circumstances. The present case

differs from *McCaskill* in several regards. First, viewing the evidence in a light most favorable to

the Plaintiff, Plaintiff complied with all of the officers' orders during the incident in question.

*See Exhibit 5*, Robinson Dep. at 120:10-13; 121:4-15; 126:19-24; 126:25-127:15; 129:14-15).

Additionally, Defendants Mazzuca and Haak freely admit that Plaintiff was not verbally or

physically hostile towards the officers. (*See Exhibit 1*, Mazzuca Dep. at 91:8-10; and *Exhibit 6*,

Haak Dep. at 135:22-137:3). He did not "back-talk," and he did not make any overt threatening

movements. *Id.* In fact, even taking the officers' version of event as true, the Plaintiff was down

on his knees and unable to flee. (*See Exhibit 6*, Haak Dep. at 145:19-146:4; and *Exhibit 8*, Wells

Dep. at 76:8-11; 77:9-12).

Additionally, unlike in *McCaskill*, where the suspect was pushed down onto a mattress,

the Plaintiff in the instant case was slammed down onto concrete, with enough force to cause

him to suffer, among other things, a fractured cheek bone and brain injury. Given the

circumstances, it is difficult to see how such conduct could be considered objectively reasonable.

    **2.**    **Viewing the evidence in a light most favorable to the Plaintiff, all of the**
        **Defendant officers are liable for the Fourth Amendment violation.**

Plaintiff testified that as he stood in the street with his hands handcuffed behind his

back, someone hit the back of his leg, buckling his knee. (*See Exhibit 5*, Robinson Dep. at

131:4-131:81:5). He then felt more than two hands around his waist, and was lifted in the air,

and body slammed to the ground. (*See Exhibit 5*, Robinson Dep. at 131:4-8). The fact that

Plaintiff is unable to specifically identify which particular Defendants acted under the color of

law and caused or contributed to the violations does not justify summary judgment against Defendants Haak, Wells, Cawood and Patil.   In instances where two or more officers are involved in the assault on plaintiff's person, it may be near impossible to determine exactly which of the many officers delivered the blows that caused serious injuries to the plaintiff. Operating under the theory of joint liability, courts have found that, where plaintiff is unable to identify a particular officer among many officers who were involved in an incident, all officers involved are liable. *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), *cert. denied*, 480 U.S. 916, 94 L. Ed. 2d 686, 107 S. Ct. 1369 (1986).   In *Grandstaff*, the Plaintiff was shot but he was unable to identify which officer shot the bullet which actually killed him.  The Court held the firestorm which killed the Plaintiff was a joint operation, and each officer who fired a gun was equally responsible.

In the case at hand, the undisputed evidence presented clearly inculpates Officer Mazzuca as the officer that delivered the blow which caused serious injuries to the Plaintiff. However, under Mr. Robinson's account, Defendant Mazzuca acted along with other officers, to seize and control the Plaintiff, so they are all liable for his injury, regardless of which specific Defendant actually caused the injury. Indeed, Defendants' police practices expert, Samuel Wichner agrees that if Mr. Robinson was lifted by the officers, and body slammed as he described, that he was subjected to excessive force in violation of the Fourth Amendment. (*See Exhibit 4*, Wichner Dep. at 169:17-170:17).  Whether this was a joint operation which resulted in the deprivation of Plaintiff's constitutional rights, and/or which of the Defendants present at the scene were involved in the actions that deprived Mr. Robinson of his constitutional rights is a factual issue for the jury.

20

3.  **The Defendant officers are not entitled to qualified immunity because any reasonable officer would understand that the force used against Plaintiff, which resulted in his face slamming against pavement, violated the Plaintiff's Fourth Amendment Constitutional right to be free from excessive force.**

In deciding whether a police officer is entitled to qualified immunity, courts must (1) determine, taking the facts in the light most favorable to the party asserting the injury, whether the facts alleged show an officer's conduct violated a constitutional right; and, if so (2) determine if the constitutional right was clearly established at the time of the event at issue. *Saucier v. Katz,* 533 U.S. 194, 200 (2001). For a constitutional right to be clearly established "its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Jones,* 325 F.2d at 531 (citations omitted) "The standard again is objective reasonableness: the 'salient question' is whether the 'state of the law' at the time of the events at issue gave the officer 'fair warning' that his alleged treatment of the Plaintiff was unconstitutional'" *Id.* at 531 (citations omitted). In analyzing whether the particular officer's conduct was objectively reasonable in light of then established constitutional rights, the test is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of all the circumstances. *Rowland v. Perry,* 41 F.3d at 167.

Clearly, Plaintiff Robinson had a constitutional right under the Fourth Amendment to be free from excessive use of force, which Defendants do not deny. Plaintiff has set forth above ample evidence to prove such a constitutional violation. Accordingly, to determine if qualified immunity attaches the issue is whether Officer Mazzuca would have reasonably known that his conduct violated Plaintiff's well established constitutional rights. Defendants do not even try to argue Officer Mazzuca did not know that pushing an already handcuffed Plaintiff to the ground was unconstitutional, nor could they, based on well established case law, **and their own expert's opinion.** Instead, Defendant ignores the factual issues in dispute, and simply argues

21

that Plaintiff cannot identify his assailant.  This is irrelevant, as it relates to Officer Mazzuca,

since he admits that he was the officer responsible for pushing the Plaintiff.

Defendants further argue that because Plaintiff was noncompliant with officers' orders, it

was reasonable for Officer Mazzuca to give the Plaintiff a "moderate" push forward, and that an

objectively reasonable officer would not have known that such a push would violate the

suspect's constitutional rights.   This argument is flawed in several aspects. First, Defendants,

again, ignore that the Court must view the evidence in a light most favorable to the Plaintiff – in

other words, **the Court must assume the truth of Plaintiff's testimony that he was compliant.**

Second, pushing is not a reasonable or appropriate method for proning a suspect onto the ground.

(*See Exhibit 7,* Berry Dep. at 72:14-73:22).  Pushing is particularly unreasonable and

inappropriate where, as here, the suspect is already handcuffed with his hands behind his back.

(*See Exhibit 16*, Peters Dep. at 118:18-22; *Exhibit 4*, Wichner Dep. at 7-20; and *Exhibit 9*, Patil

Dep. at 108:3-17; 113:4-8).

Moreover, even assuming that a moderate push is found to be reasonable, the fact

remains that Defendant Mazzuca pushed Plaintiff to the ground with enough force to break his

zygomatic arch.  A "moderate" push clearly would not be sufficient to cause the extent of the

injuries that Plaintiff suffered.  While it is true that "not every push and shove violates a

suspect's constitutional rights," *Graham v. Connor,* 490 U.S. at 396, Defendant Mazzuca's use

of force, when the facts are viewed in a light most favorable to the Plaintiff, was not a simple

"push or shove" but a demonstration of excessive use of force, which any reasonable officer

would have known was a violation of a then existing constitutional right.

Courts have frequently denied qualified immunity to police officers even in situations

when the officer's use of force might appear to be justified because the arrestee's suspected

criminal activity or attempts to resist arrest. *See Kane v. Hargis*, 987 F.2d 1005 (4th Cir. 1993) (even though suspect admitted criminal culpability and resisted arrest, where the officer repeatedly pushed suspect's face into the ground after she had already been pinned and secured, a reasonable officer would have known such force was excessive, because after plaintiff was secured, she did not pose a threat.). Qualified immunity has also been denied in cases where an officer's force might have seemed objectively reasonable because the injuries suffered by the secured individual were less severe than those suffered by the Plaintiff. *Alexis v. McDonald's Restaurants of Mass., Inc.*, 67 F.3d 341 (1st Cir. 1995) (even though suspect only suffered bruises to her legs, the sudden, unannounced, violent seizure and removal of her person was not objectively reasonable, since there is no evidence or suggestion that she posed a risk of flight, attempted to resist or evade arrest, or threatened the peace, property or safety of anyone); *McDowell v. Rogers*, 863 F.2d 1302 (6th Cir. 1988) (a serious or permanent injury is not a prerequisite to a 1983 claim -- even though the plaintiff did not suffer a serious or permanent injury, the force used was unnecessary and malicious given that the plaintiff was handcuffed and not trying to escape or hurt anyone). In the instant case, the Plaintiff was suspected of a felony, but neither attempted to flee the scene nor resisted arrest; he was handcuffed, and did not present a threat to anyone. Thus the need for the force used by Defendant Mazzuca, which caused Plaintiff severe physical and cognitive injuries, was non-existent, and the facts clearly present a jury issue as to whether the force used was excessive and unreasonable under the circumstances.

Therefore, Defendant Mazzuca is not entitled to qualified immunity. Similarly, it is undisputed that no objectively reasonable officer would have believed that lifting the Plaintiff off the ground and body slamming him on to concrete did not violate Plaintiff's existing constitutional rights. (*See Exhibit 4*, Wichner Dep. at 169:17-170:17). Accordingly, viewing the

23

facts in the light most favorable to the Plaintiff, none of the officers would be entitled to qualified immunity.

> **4.    Defendant Patil should be held liable for the injury inflicted by his subordinate officers, because he had actual or constructive knowledge that his subordinate officers were not following proper arresting protocol, and his failure to supervise at the scene resulted in a constitutional injury to Plaintiff.**

Supervisory liability may be established under § 1983 if (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud,* 13 F.3d 791 (4th Cir. 1994); *Slakan v. Porter,* 737 F.2d 368, 373 (4th Cir. 1984).

> **a.    Sergeant Patil had actual knowledge of conduct that posed pervasive and unreasonable risk of harm.**

"Pervasive" and "unreasonable" risk of harm may be established with evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury. *Shaw,* 13 F.3d at 799.

The Montgomery County Use of Force Directive states, that an officer should not use more force than is reasonably necessary under the circumstances to affect an arrest or protect themselves or citizens from harm. (*See Exhibit* 20, Use of Force Directive). As set forth below, there is clear evidence that SAT officers in Sergeant Patil's unit were not using the least amount of force necessary by ignoring Montgomery County protocols for proning suspects to the ground. The failure to use these protocols was widespread within the SAT unit that Defendant Patil

24

supervised, and subjected suspects to unreasonable risk of constitutional injury.   Pushing

suspects to the ground is not an acceptable method of proning a suspect, and doing so is likely to

result in the suspect suffering injuries, as Plaintiff Robinson did.  (*See Exhibit 10,* Berry Dep. at

73:11-16; *Exhibit 16,* Peters Dep. at 118:18-22; *Exhibit 4,* Wichner Dep. at 175:7-20; and *Exhibit*

*9,* Patil Dep. at 108:3-17; 113:4-8).  Montgomery County Police protocol clearly states the

proper method of proning a suspect to the ground is as follows:

> 5.      Command the subject to go to one knee slow, now the other one.
>
> 6.      Have the subject with the left hand (right hand stays up) reach out in front
> of them as far as they can. Placing that hand on the ground (support should
> be on their left palm) **walk out on that hand while lowering their upper**
> **torso to the ground**. Now have the subject place his/her right hand to the
> ground (next to the left hand).
>
> 7.      The subject's hands are now extended out/up in front of him/her – palms
> down and fingers spread apart.

>     *See Exhibit 20,* Handcuffing Prone Position - Outline. (emphasis added)

Thus, under the established practices of Montgomery County, in proning a suspect, a

police officer should allow the suspect to slowly walk himself out onto the ground – there is no

mention of pushing or other alternative procedures for proning.  However, Defendant Mazzuca

freely admits that "in general, [officers] don't have people walk themselves out as it's described

[in the manual]." (*See Exhibit 1,* Mazzuca Dep. at 85:7-12).  Despite having received training on

the correct method for prone handcuffing, and having been aware that the training guides

specifically instruct all officers to have suspects slowly walk themselves out onto the ground

(*See Exhibit 1,* Mazzuca Dep. at 83:2; 84:6-10), Defendant Mazzuca has never utilized this

method of prone handcuffing himself, because it's easier to just give a quick command. (*See*

*Exhibit 1,* Mazzuca Dep. at 86:9-87:14), and since becoming an officer in 1994, he has never

once seen any officer follow this guideline when proning a suspect. (*See Exhibit* 1, Mazzuca

Dep. at 87:18-22). Therefore, officers' breaking of the rules is more than the "single or isolated incident" that Defendants allege it was.

Additionally, Sergeant Patil was aware that his officers were deviating from the prone handcuffing guidelines set out by the police training manuals, since he regularly observed his officers doing the procedure and then discussed his observations with them. (*See Exhibit 9,* Patil Dep. at 53:18-54:11). However, rather than correcting their deviance, Sergeant Patil allowed the conduct to continue. (*See Exhibit 9,* Patil Dep. at 46:20-49:3). In fact, when Sergeant Patil personally trained his SAT team officers in the technique of prone handcuffing, he never mentioned the walking out method for getting a suspect on the ground. (*See Exhibit 9,* Patil Dep. at 48:5-20).

Clearly, Sergeant Patil had actual knowledge that his officers were not obeying the guidelines set forth by the police training manuals, which are specifically designed to present the least amount of risk to both police officers and suspects. As a result of this widespread deviation from accepted and well-established police standards, suspects like Plaintiff Robinson were exposed to an unreasonable risk of injuries and constitutional violations.

**b.    Sergeant Patil's failure to act amounted to deliberate indifference or tacit authorization of his officers' unconstitutional conduct.**

"Deliberate indifference" may be established by demonstrating a supervisor's "continued inaction in the face of documented widespread abuses." *Slakan v. Porter,* 737 F.2d at 373. *See also Miltier v. Beorn,* 896 F.2d 848 (4th Cir. 1990); *Withers v. Levine,* 615 F.2d 158 (4th Cir. 1980); *Vinnedge v. Gibbs,* 550 F.2d 926, 928 (4th Cir. 1977).

In the present case, Sergeant Patil continually failed to act in the face of what cannot be considered mere "isolated instances" of misconduct, but widespread and repeated violations of police training protocols that had the obvious potential for constitutional violations. The

26

standards set forth by the police department are intended to ensure maximum safety for both the police officers and their suspects, and when officers stray from those standards, the potential for harm arises. (*See Exhibit 10,* Berry Dep. at 14:9-16).  As a supervisor, it was Sergeant Patil's duty to ensure that his officers adhered to departmental rules, regulations, policies, and procedures (*See Exhibit 9,* Patil Dep. at 15:9-13); yet he freely admits that he did not require his officers to follow the steps of the procedure for prone handcuffing set out by the police department. (*See Exhibit 9,* Patil Dep. at 46:20-47:12).

In describing the methodology for prone handcuffing that he teaches to his SAT team officers, he fails to mention several steps listed in the prone handcuffing guidelines provided by the police department. (*See Exhibit 9,* Patil Dep. at 48:5-20).  Failure to adequately train subordinate officers in necessary skills has been held to be sufficient basis for liability. *Febus-Rodriguez v. Betancourt-Lebron,* 14 F.3d 87 (1st Cir. 1985) (holding supervisor liable where he knew or should have known of any problems with the recruitment and training of officers, such that his conduct reflected callous or reckless indifference).  In the police department, officers are trained to act with the least amount of force necessary to effectuate an arrest, to avoid causing physical bodily harm. (*See Exhibit 20,* Use of Force Directive).  In the prone handcuffing situation, the least amount of force or injury would result from asking a suspect to walk himself out.  Pushing a suspect from behind would be more likely than not to harm a suspect. (*See Exhibit 10,* Berry Dep. at 72:14-73:6). The Supreme Court in *City of Canton v. Harris,* 489 U.S. 378, 391 (1989) in the context of an analysis of municipal liability "did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Board of County Comm'rs of*

27

*Bryan County v. Brown,* 520 U.S. 397, 409 (1997) (citing *City of Canton,* 489 U.S. at 390, n.10). The same analysis would apply in the context of supervisory liability. Thus, Sergeant Patil, in allowing his officers to deviate from accepted and well-established police department guidelines, and failing to thoroughly instruct his officers on the steps laid out in said guidelines, was deliberately indifferent to, and tacitly authorized, the unconstitutional conduct of his subordinate officers.

### c. Sergeant Patil's failure to act was a proximate cause of the violation of Plaintiff Robinson's constitutional rights.

The issue under this prong of the test is whether the supervisor has done something, or failed to do something that he should have done, which was a proximate cause of the violation of the Plaintiff's constitutional rights. *Shaw v. Shroud,* 13 F.3d at 799. Causation is established when the plaintiff demonstrates an "affirmative causal link" between the supervisor's inaction and the harm suffered by the plaintiff. *Id. See also Slakan v. Porter,* 737 F.2d at 376; *Rizzo v. Goode,* 423 U.S. 362 (1976). The court in *Slakan* established that "proof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains ... [or] may be supplied by [the] tort principle that holds a person liable for the **natural consequences of his actions**." *Slakan,* 737 F.2d at 376 (quoting *Wellington v. Daniels,* 717 F.2d 932, 936 (4th Cir. 1983)).

Here, as a direct result of Sergeant Patil's failure to properly train, direct and supervise his officers regarding the correct methodology for prone handcuffing, Plaintiff Robinson was unreasonably exposed to risk of harm and injury when the arresting officers pushed him to the ground, in violation of established police protocol. If Sergeant Patil had properly trained his officers, or had made efforts to correct their regular and repeated inappropriate use of force, Defendant Mazzuca would have known that pushing a handcuffed suspect is not only an unsafe

way to get the suspect onto the ground, but also a clear violation of Montgomery County police department standards and protocol. (*See Exhibit 9,* Patil Dep. at 108:3-17; 113:4-8; and *Exhibit 10,* Berry Dep. at 72:14-73:22). Thus, there are facts in dispute, which demonstrate that as a direct result of Sergeant Patil's deliberate indifference towards, and tacit authorization of his officers' inappropriate conduct, Plaintiff Robinson was caused to be slammed onto the ground, and suffer a fracture of the zygomatic arch, and a brain injury. Accordingly, the issue of supervisory liability should go to the jury.

### d. Sergeant Patil failed to take control of the operation to ensure that Plaintiff was not subject to any constitutional violations.

As the commanding officer involved in the operation, Sergeant Patil had a duty to intervene and exercise appropriate command functions, and take control of the situation on the night in question. (*See Exhibit 16,* Peters Dep. at 119:14-122:26); *see also Baker v. Monroe Tp.,* 50 F.3d 1186, 1193-94 (3d Cir. 1995) (plaintiff's evidence was sufficient to withstand summary judgment motion on issue of supervisory liability where plaintiffs demonstrated facts from which a jury could infer that the supervisor on the scene, though in a different room, was aware of how the plaintiffs were being treated and acquiesced in such treatment). Since Sergeant Patil was involved in the stop, he should have been in command of the situation throughout. (*See Exhibit 16,* Peters Dep. at 119:14-122:6). However, instead of taking control, he allowed his officers to handle the situation; he failed to take charge of the scene, and failed to direct what was going on. (*See Exhibit 9,* Patil Dep. at 140:13-14). Therefore, the issue of supervisory liability should go to the jury on this basis as well.

29

5.    **There is evidence that Montgomery County's had a custom of allowing its police officers to violate policies and procedures which would lead to violations of constitutional rights, failed to adequately investigate or discipline officers for excessive use of force, and failed to adequately train its police officers.**

Municipal liability may be established where there exists a "policy" or "custom" of the city that has directly caused the constitutional violation at issue. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L. Ed. 611 (1978). "Custom" may be proven by evidence of a widespread practice that, even if not authorized by written law or express municipal policy, is so "permanent and well settled as to constitute a custom or usage with the force of law." *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598,, 26 L.Ed. 2d 142 (1970) That is, the "duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the . . . governing body [or policy maker with responsibility for oversight and supervision] that the practices have become customary among its employees — in the proper exercise of its official responsibilities, the governing body should have known of such practices. *Spell v. McDaniel,* 824 F.2d 1380, 1387 (4th Cir. 1987). When the existence of such a custom or practice has been established, liability should be imposed regardless of whether official policymakers had actual knowledge of the practice. *Thompson v. City of Los Angeles,* 885 F.2d 1439 (9th Cir. 1989).

Additionally, where a plaintiff can prove that the violation of his/her constitutional rights was caused by acquiescence by policymaking municipal officials in previous unconstitutional conduct by city employees, and that the "occurrence of the specific violation was made reasonably probable by permitted continuation of the custom," the municipality may also be held liable for the constitutional violation. *Spell,* 824 F.2d at 1391. Policymakers are considered to have "acquiesced" in such practices where the practices are so significant or widespread that

30

constructive knowledge may be inferred. *McNabola v. Chicago Transit Authority*, 10 F.3d 501

(7th Cir. 1993).[3]

    a.    **The SAT team's blatant and unchecked disregard for well-established police guidelines amounted to a custom of using excessive force which Montgomery County officials knew or should have known about, and therefore acquiesced to.**

        Montgomery County, Maryland has a well-established set of rules, regulations, policies, procedures, and standards of conduct that police officers are instructed to follow when dealing with suspects. Among them, the procedure for prone-handcuffing a suspect is clearly laid out in step-by-step instructions for how to approach each stage of the encounter. (*See Exhibit 20,* Handcuffing Prone Position - Outline).

        In the Montgomery County Police Department, police officers are trained to not use more force than necessary under the circumstances to affect an arrest. (*See Exhibit 21*, Use of Force Directives). In particular, the guideline for prone handcuffing is designed to conform to that objective of causing the least possible amount of physical harm, and if followed, presents the safest method of prone handcuffing a suspect. (*See Exhibit 10,* Berry Dep. at 13:19-15:15). When the procedures are not adhered to, the suspect is likely to be injured. (*See Exhibit 7,* Berry Dep. at 72:22-73:6).

        However, the SAT team readily admits that it does not follow the procedure set forth in the "Handcuffing Prone Position" lesson plan (attached hereto as Exhibit 20) when prone handcuffing a suspect, **and never has.** (*See Exhibit 1*, Mazzuca Dep. at 86:2-89:2). Despite the fact that the guideline clearly states that the officer should have a suspect slowly walk himself into a prone position, Defendant Mazzuca freely admits that "in general, [officers] don't have

---

[3] Defendant accurately states that the claims against Chief Manger are against him in his official capacity only. Accordingly, Summary Judgment as it relates to Chief Manger should also be denied, since Plaintiff has demonstrated that there are genuine issues of material fact in dispute which preclude summary judgment on the claims against the County.

people walk themselves out as it's described [in the manual]." (*See Exhibit 1,* Mazzuca Dep. at 85:7-12). Defendant Mazzuca himself has never utilized this method of prone handcuffing, as it is easier to just give a quick command (*See Exhibit 1,* Mazzuca Dep. at 86:9-87:14), and since becoming an officer in 1994, he has never once seen any officer follow this guideline when proning a suspect. (*See Exhibit 1*, Mazzuca Dep. 87:18-87:22).

Sergeant Patil's testimony corroborates this point, as he clearly states that in making an arrest, "we don't break out a book and go through a checklist of what we're doing," and "we don't have a written script that's provided to every single officer that they must comply with." (*See Exhibit 9,* Patil Dep. at 46:20-47:12). Sergeant Patil not only condoned this non-compliance with the rules, but also encouraged it, saying, "there is not a hard and fast rule about prone handcuffing," (*See Exhibit 9,* Patil Dep. at 53:3-5). Indeed, John Cunningham, who was District Commander of the Third District of Montgomery County at the time of the incident, and Patil's superior, likewise condoned SAT officers' deviation from established standards of conduct. While he agreed that his officers were expected to follow the established prone handcuffing procedures (*See Exhibit 22,* Cunningham Dep. at 109:6-10), and that having suspects walk out and ease onto the ground is the proper protocol (*See Exhibit 22,* Cunningham Dep. at 110:5-10), he did not enforce this rule, implying that it is impossible for an officer to conform with every step laid out in the protocol. (*See Exhibit 22,* Cunningham Dep. at 110:17-19).

It is clear from the Defendants' own statements, and those of superior officers within the police force, that there is a widespread practice among Montgomery County police of disregarding department regulations/guidelines, and thereby utilizing methodologies which are reasonably likely to cause constitutional violation, as happened in this case. The fact that two superior officers freely admit that their officers do not stick to the guidelines, nor are they

32

expected to, and that in his 15 years on the force Defendant Mazzuca had never once utilized or seen another office utilize the established procedure for prone handcuffing, implies that such conduct was permanent, well settled, and commonly accepted. (*See Exhibit 1*, Mazzuca Dep. at 87:18-87:22). As a policymaking body with responsibility for oversight and supervision, the county knew or should have known, through the proper exercise of its official responsibilities that its police officers were not properly acting in accordance with the established regulations and standards of conduct. The duration and frequency of the conduct, suggested by the Defendants' own testimony, clearly warrants a finding of either actual or constructive knowledge by the county that the practice had become customary among its employees. The Supreme Court in *City of Canton v. Harris* (1989) "did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Board of County Comm'rs of Bryan County*, 520 U.S. at 409 (citing *City of Canton*, 489 U.S. at 390, n.10). In the case at hand, Montgomery County's acquiesced to the SAT team's deviation from accepted standards of conduct, which made it reasonably probable that there would be violations of suspects' constitutional rights.

As a direct and proximate cause of the police department's widespread custom of disregarding safe policing procedures, and Montgomery County's acquiescence to that custom, Plaintiff Robinson was caused to suffer grievous injury while being detained by Defendants acting in their official capacity as employees of the county. If the county had been more stringent in the exercise of their oversight and supervisory responsibilities, and had monitored officers to ensure that they were obeying established safe policing guidelines and procedures, SAT officers would have known that it was not acceptable to deviate from the guidelines and

arbitrarily alter their the methodology for proning suspects, as they saw fit.   Defendant Mazzuca

would then have known that he should allow Plaintiff Robinson to walk himself out onto the

ground, rather than pushing Plaintiff forward onto the ground.  As previously established,

pushing is not an acceptable method of proning a suspect (*See Exhibit 10*, Berry Dep. at 72:14-

73:22), and is particularly inappropriate and excessive when the suspect has already been

handcuffed. (*See Exhibit 16*, Peters Dep. at 118:18-22; and *Exhibit 4*, Wichner Dep. at 175:7-20).

As a direct and proximate result of Defendant's inappropriate and excessive use of force,

Plaintiff Robinson suffered a fracture to his zygomatic arch, as well as a brain injury, when his

head was slammed into the concrete pavement.

When the facts are viewed in a light most favorable to the Plaintiff, if is clear that the

issue of municipal liability should go to the jury.

        **b.**      **Montgomery County's failure to investigate an excessive force complaint made against Sergeant Patil demonstrates the county's deliberate indifference towards the constitutional rights of citizens.**

Municipal liability may also be established when the defendant has a policy or custom of

inadequate supervision and discipline of officers who have committed constitutional violations in

the past. *Spell v. McDaniel*, 824 F.2d 1380. Failure to discipline officers for police misconduct is

a sufficient basis for a municipal liability claim because it shows deliberate indifference on the

part of the municipality to the constitutional rights of persons with whom the police may come

into contact. *Id.*; *also see Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996); *Vann v. City of

New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) ("deliberate indifference" may be inferred if

complaints are followed by no meaningful attempt on the part of the municipality to investigate

or to forestall further incidents).

Liability against municipalities may be based upon a single incident, and the requirements of "policy" and "custom" do not necessitate proof of a long-standing practice. *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986); *Owen v. City of Independence, Mo.,* 445 U.S. 622 (1980). Additionally, the mere existence of formal Department procedures to receive and investigate complaints cannot shield a municipality from liability. *Beck v. City of Pittsburgh,* 89 F.3d at 974.

In the case at hand, Sergeant Patil, the supervisory officer responsible for supervising and training the other Defendants in this case, and ensuring compliance with rules, regulations, policies and protocols of the County, was involved in an incident which was strikingly similar to the incident at issue. In particular, it was alleged that on June 15, 2005, Sergeant Patil along with 8 to 10 other police officers pinned downed and repeatedly beat a clearly unarmed suspect, **and slammed him face-first into the ground while he was handcuffed**. (*See Exhibit 14,* notes from Eberley interview of Bauers; *Exhibit 13,* Maggie Bauer sworn statement; and *Exhibit 15,* Freeman e-mail; and *Exhibit 11,* Eberley Dep. at 113:13-15; 115:9-12; 138:4-10). Three witnesses voluntarily contacted the police department to complain about what they saw. (*See Exhibit 11,* Eberley Dep. at 44:7-12; 134:9-15; *Exhibit 13,* Maggie Bauer sworn statement; *Exhibit 14,* notes from Eberley interview of Bauers). The complaints filed against Sergeant Patil and the other officers involved in the incident alleged (1) excessive use of force, and (2) excessive police presence on the scene. (*See Exhibit 11,* Eberley Dep. at 60:13-15).

Following these complaints, the Internal Affairs Division (IAD) conducted an investigation, and found that there were no administrative violations. (*Exhibit 12,* Letter from Captain Douglas McFee, Director of Internal Affairs Division, to Mr. & Mrs. Bauers (October 7, 2005)). However, the investigations focused only on the allegation of excessive police presence

35

– the more troubling issue of excessive force was not addressed at all. (*See Exhibit 11,* Eberley

Dep. at 59:10-15; and *Exhibit 12,* Letter from Captain Douglas McFee, Director of Internal

Affairs Division, to Mr. & Mrs. Bauers (October 7, 2005)). Moreover, these investigations were

perfunctory and wholly inadequate. First, two of the witnesses, Mr. and Mrs. Bauer, voluntarily

contacted the police station to give their witness accounts of the incident, the attendant at the

station refused to take their statement and told them there was no one there who could speak to

them. (*See Exhibit 13,* Eberley Dep. at 44:7-47:21; and *Exhibit 21,* Margaret Bauer Written

Statement). Were it not for the tenacity of Mrs. Bauer, who made the effort to look online for

the contact information of superior officers within the police department, and email them her

account of the events, the Bauers' complaints would never have made it into the attention of the

IAD. (*See Exhibit 13,* Margaret Bauer Written Statement).

Additionally, in conducting their investigation of the events, the IAD disregarded the

account given by Jane Freeman, because she refused to physically go down to the police station

to make a statement, despite the fact that she had already voluntarily and independently called

the police station to complain about what she saw on the day of the incident. (*See Exhibit 11,*

Eberley Dep. at 149:4-9; 150:4-16).

Montgomery County cannot be shielded from liability simply because it had an

investigative process in place, and an investigation was conducted in to this June 15, 2005

incident. It is not enough that an investigative process be in place; "the investigative process

must be real . . . the mere fact of investigation for the sake of investigation does not fulfill a

city's obligation to its citizens." *Beck v. City of Pittsburgh,* 89 F.3d at 974. The perfunctory

investigation conducted with regard to the June 15 incident clearly exhibited deliberate

indifference on Montgomery County's part towards the constitutional rights of its citizens. The

36

two independent and voluntary complaints by civilian witnesses to the incident should have been sufficient to put the county on notice that Sergeant Patil had a propensity for using excessive force, and should not have been in charge of training, and supervising subordinate officers. It should have been no surprise that Sergeant Patil did not train his SAT unit to follow Montgomery County policies and protect and preserve the Constitutional rights of citizens.

Additionally, the fact that the IAD disregarded an eyewitness account, ignored an entire allegation – use of excessive use of force, and failed to discipline Sergeant Patil in connection with the excessive use of force in this incident, sends a message to the officers that he supervises that excessive force will be tolerated. Montgomery County's deliberate indifference and failure to properly investigate the events surrounding the June 15, 2005 incident present a jury issue on the issue of whether municipal liability should attach.

> c.   **Montgomery County's failure to investigate in the present case demonstrates the County's deliberate indifference towards the constitutional rights of citizens.**

Post-event evidence was expressly allowed by the Fifth Circuit in *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), *cert. denied*, 480 U.S. 916, 94 L. Ed. 2d 686, 107 S. Ct. 1369 (1986). The *Grandstaff* Court held that policymaker's disposition, and policy on the use of deadly force, after the date of the incident was evidence of his disposition prior to the date in question. *Grandstaff*, 767 F.2d at 161 (citations omitted)

> As subsequent conduct may prove discriminatory motive in a prior employment decision, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973), and subsequent acts may tend to prove the nature of a prior conspiracy, *see Anderson v. United States*, 417 U.S. 211, 219, 94 S. Ct. 2253, 2260, 41 L. Ed. 2d 20 (1974), so the subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy.
>
> *Id.*

37

In the instant case Montgomery County showed deliberate indifference to the constitutional rights of its citizens by failing to properly investigate allegations of excessive force used against Plaintiff Robinson. On the night of the incident, shortly after it was discovered that the Plaintiff had not stolen the vehicle in question, the Plaintiff approached Sergeant Patil and told him that his face hurt as a result of being forced to the ground by the officers. (*See Exhibit 9,* Patil Dep. at 156:2-157:17). This statement was noted by Sergeant Patil in his incident report. (*See Exhibit 23,* Incident-Offense Report No. R06016840). Indeed, the ambulance report indicates that Plaintiff suffered a closed head injury. (*See Exhibit 24,* Montgomery County Fire and Rescue Report). Yet despite this clear evidence that officers used enough force during this seizure to cause serious bodily injury to the Plaintiff, no further investigation was conducted into the matter.

Amazingly, Defendants argue that this total failure to investigate this incident should be excused because Plaintiff did not file a complaint within 90 days of the event. While Plaintiff recognizes that the Officer Bill of Rights (LEOBR MD Code Ann., Pub. Safety sections 3-101-3-113) precludes the police department from disciplining an officer if the complainant does not make a complaint within 90 days of the incident, clearly the police department is not precluded from doing an investigation to determine if their own policies and procedures were violated. In fact, Plaintiff did file a complaint with Montgomery County on July 10, 2006, in the form of a notice letter. (*See Exhibit 25,* Notice Letter to County Executive for Montgomery County). While the department may not have been able to discipline any of the involved officers, it should have initiated an independent investigation to ascertain exactly what happened or what type of forced was used, so that any inappropriate conduct may be corrected.

The fact that no investigation was conducted, and that the incident was brushed off by superior officers and Montgomery County as being insignificant demonstrates a deliberate indifference towards the constitutional rights of citizens. The Court in *Grandstaff* held that if an "episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger" *Grandstaff* 767 F.2d at 171. Similarly, in the case at hand, it can be said, that if an event, in which it was alleged that police officers fractured the face bone of an innocent citizen received no attention, or action by policy makers, a jury should be entitled to conclude that it was accepted as the way things are done, and have been done in Montgomery County.

Additionally, this is not the "single act or isolated incident" which the Defendants imply it is. As mentioned previously, the County also blatantly failed to properly investigate complaints against Sergeant Patil for use of excessive force in arresting, despite clear and independent evidence that inappropriate force was used. The County's repeated omissions and failure to act in such cases imply that there is policy of tacit authorization for officer's excessive use of force in arresting suspects, and as such, shows a deliberate indifference towards the constitutional rights of citizens.

      **d.**      **Montgomery County's failure to provide adequate training to police officers amounted to deliberate indifference to the constitutional rights of citizens.**

Inadequacy of training may serve as a basis for liability where the failure to train amounts to "deliberate indifference" to the constitutional rights of persons with whom the police may come into contact. *City of Canton,* 489 U.S at 388; *Jordan v. Jackson,* 15 F.3d 333, 341 (4th Cir. 1994). Where "in light of duties assigned to specific officers or employees the need for more or

39

different training is so obvious, and the inadequacy is so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need," the failure to provide proper training may be said to represent a policy for which the city is responsible. *City of Canton,* 489 U.S. at 390. Essentially, if "it can be shown that policymakers were aware of, acquiesced in, a pattern of constitutional violations," failure to train may form a basis for liability. *Lytle v. Doyle,* 326 F.3d 463, 474 (4th Cir. 2003) (citing *City of Canton,* 489 U.S. at 397). The method by which a police force is trained, including the design and implementation of training programs and the follow-up supervision of trainees is considered a matter of "policy" as defined by the Court in *Monell. Spell v. McDaniel,* 824 F.2d at 1390. Therefore, in resolving the issue of a city's liability, the "focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 390.

In the present case, Plaintiff has established that the County failed to adequately train its police officers. Dr. John G. Peters, an expert in police liability with years of experience in evaluating police training programs, including tactical handcuffing, clearly stated in his testimony that the lesson plans for prone handcuffing are inadequate. (*See Exhibit 16,* Peters Dep. at 57:13-61:23). Contrary to what Defendants claim, Dr. Peters does not merely allege that there could have been more, better, or different training – his testimony was that the training provided was totally inadequate in a number of respects. Not only is there no objective testing criteria in place, but also officers are not taught how to adapt in situations where a suspect may not have full possession of his facilities, or what the possible consequences of deviating from the training guides may include. (*See Exhibit 16,* Peters Dep. at 78:24-82:6). In light of the fact that prone handcuffing is a commonly used procedure in vehicle takedowns and other situations, and

the officers in this case have consistently testified that they ignore the methodology taught, there is clearly undisputable evidence that there is obvious need for actions to avoid violations of citizens' constitutional rights. *See Southern Holdings v. Horry County*, 2007 U.S.Dist. LEXIS 25021 **19-20 (D.S.C. 2007).

The County claims Dr. Peters ignores the special training that the SAT team receives. To the contrary, the County has failed to provide any uniform or documented training provided to the SAT team regarding prone handcuffing, or any other training for that matter. The only lesson plans or other standards provided are those previously referenced, which SAT team routinely ignores. Indeed, as set forth, *supra,* Sergeant Patil, who conducts such training, freely admits that he does not follow established training guidelines.

Additionally, Defendants mischaracterize Dr. Peter's testimony when they state that he did not point to any particular standards, and that his opinions are not based on any specific nationally accepted standards. In addition to the International Association of Chiefs of Police, which he references in his deposition, Dr. Peter's report which is attached hereto in its entirety as *Exhibit _* identified multiple standards and authoritative texts including but not limited to: Commission on Accreditation for Law Enforcement Agencies (CALEA) (2001, November) *Standards for Law Enforcement Agencies;* Dick, W., Carey L. and Carey J.O. (2001); *The systematic Design of Instruction* (5th ed.); Brave, M.A., & Peters, Jr. J.G. (1993) *Understanding & managing Law Enforcement Liability; Critical Areas of Concern* 1993, Eau Claire, WI: Institute for Liability Management; Graziano, A.M. & Raulin, M.L. (2000) *Research Methods: A Process of Inquiry* (3rd and 4th Eds.)

As such, Dr. Peters' opinions do meet the threshold of establishing a *Monell* claim against Montgomery County based on failure to train, and this issue should go to the jury.

41

**6.     State Constitution violations have been established under the Maryland Declaration of Rights**

**Article 2.** Article 2 of the Maryland Declaration of rights provides in relevant part:

> The Constitution of the United States, and the Laws made, or which shall be made, in pursuance thereof, . . . are, and shall be the Supreme Law of the State; and the Judges of this State, and all the People of this State, are, and shall be bound thereby; anything in the Constitution or Law of this State to the contrary notwithstanding. *Md. Const. Decl. of Rights*, art. 2.

If an action infringes upon the Federal Constitution, it is also violates Article 2 of the Maryland Constitution. *See Md. Comm. for Fair Representation v. Tawes*, 180 A.2d 656, 658 (Md. 1962), *appeal reported*, *Md. Comm. for Fair Representation v. Tawes*, 184 A.2d 715 (Md. 1962), *rev'd on other grounds*, *Md. Comm. for Fair Representation v. Tawes*, 377 U.S. 656, 12 L. Ed. 2d 595, 84 S. Ct. 1429 (1964). Thus, the Fourth Amendment violations set forth previously establish State Constitutional violations under Article 2. *See supra*, Part III.B.1

**Article 26.** Article 26 provides in relevant part:

> All warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted."

Because this article is *in pari material* with the Fourth Amendment to the United States Constitution, the analysis here is the same as a Fourth Amendment violation analysis. *Davis v. DiPino*, 121 Md. App. 28 (1998); *Gadson v. State*, 341 Md. 1 (1995); *Williams v. Prince George's County*, 112 Md. App. at 526. Therefore, because Plaintiff has conclusively established that there is a jury issue as to whether Defendants violated Plaintiff's Fourth Amendment rights during the incident in question, the State Constitution violations established under Article 26, should also go to the jury. *See supra*, Part III.B.1.[4]

---

[4] Plaintiff withdraws his claim under Article 24 of the Maryland Declaration of Rights.

42

7.    **Defendants' motion to dismiss the Assault and Battery claims should be denied because the officers acted with malice.**

While police officials are generally not responsible for inflicting injury on a person being arrested, they may be held liable if the officer acts with malice. *Lee v. Cline,* 384 Md. 245, 256 (2004). The question of "malice" turns on the arresting officer's motive and intent. *Thacker v. City of Hyattsville,* 135 Md. App. 268 (2000). "Malice, in this context, consists of the intentional doing of a wrongful act without legal justification or excuse. An act is malicious if it is done knowingly and deliberately, for an improper motive and without legal justification." *Elliott v. Kupferman,* 473 A.2d 960, 969 (Md. Ct. Spec. App. 1984) (citations omitted)

In the present case, Defendant Mazzuca acted with malice in pushing the Plaintiff to the ground during arrest. Taking the facts in the light most favorable to the Plaintiff, the court must accept Plaintiff's contention that he was already handcuffed and under control when Defendant Mazzuca forcibly pushed him to the ground. All experts and superior officers agree that pushing is not an acceptable method for proning a suspect to the ground – they also all agree that pushing an already handcuffed suspect is an inappropriate, excessive use of force that is more likely than not to cause an injury to the suspect. (*See Exhibit 16* Peters Dep. at 118:18-22; *Exhibit 4* Wichner Dep. at 175:17-20; *Exhibit 9,* Patil Dep. at 108:3-17; 113:4-8; and *Exhibit 10,* Berry Dep. at 14:9-16). When the procedures are not followed, the suspect is likely to be injured. (*See Exhibit 10,* Berry Dep. at 73:1-6).

Accepting the facts in a light most favorable to the Plaintiff, Plaintiff was entirely compliant and under control during the incident in question. Particularly in light of the fact that the Plaintiff was already handcuffed and did not present a flight risk, and in light of Defendant Mazzuca's training, and experience, and presumed knowledge of the consequences of pushing a handcuffed man face first on to concrete, the only rationale conclusion is that he acted with an

43

intent to injure, or at minimum with no legal justification. Clearly, pushing a handcuffed man to the concrete, knowing he could not break his fall, was a knowing and deliberate act, for which Officer Mazzuca had to have known would cause injury. Thus, his motive was improper, and as set forth, *supra,* viewing the evidence in a light most favorable to the Plaintiff, he clearly had no legal justification. Similarly, accepting the facts in a light most favorable to the Plaintiff, it is undisputed that the other officers acts of lifting the Plaintiff off the ground and body slamming him on the pavement below demonstrates obvious actual malice. Accordingly, Defendants' motion to dismiss the assault and battery claim should be denied.

     **8.**     **Defendants are not entitled to judgment on Plaintiff's claim of Intentional Infliction of Emotional Distress, because as a direct result of their reckless, extreme and outrageous conduct, Plaintiff was caused to suffer emotional distress.**

     Intentional infliction of emotional distress may be shown by evidence that that (1) the conduct was intentional or reckless; (2) extreme and outrageous; (3) there is a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress was severe. *Harris v. Jones,* 380 A.2d 611, 614 (Md. 1977); *McNeal v. Montgomery County,* 307 Fed. Appx. 766 (4th Cir. 2009). Conduct is intentional or reckless where the defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow. 380 A.2d at 614. An act is reckless if "any reasonable person would have known that such [damages] would result. *Id.* "Extreme and outrageous" conduct is defined as conduct which rises above "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Harris,* 380 A.2d at 614.

     In the instant case, the Plaintiff has satisfied each of the elements of intentional infliction of emotional distress. First, as set forth, *supra,* Defendants' conduct was intentional. Moreover, pushing an individual and/or body slamming an individual face first into the concrete below, is

extreme and outrageous. This is especially true when this was perpetrated by police officers who are trained and should understand the potential dangers of this excessive use of force.

Moreover, Plaintiff alleges that Defendant Haak said to him "don't look back or I will blow your f*****g head off." (*See Exhibit 5,* Robinson Dep. at 115:12-14.) Such conduct is clearly extreme and outrageous. The Plaintiff did not steal the vehicle in question, and in light of his complete compliance, lack of hostility, and lack of threat to officers, Defendant Haak's behavior towards him rises far beyond the "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" cited by the court in *Harris v. Jones*. At no point during the arrest did anyone explain to the Plaintiff why he was being arrested, or what they were going to do. (*See Exhibit 5,* Robinson Dep. at 130:16). Plaintiff was confused – he couldn't see anyone, but had to endure the sounds of guns clicking and police officers screaming profanities at him. (*See Exhibit 5,* Robinson Dep. at 127:22-128:18.)

Plaintiff suffered severe emotional distress as a result of the outrageous conduct. As a direct result of Defendants' excessive use of force, Plaintiff suffered, among other things, a fracture of his zygomatic arch, and a brain injury, which has resulted in permanent cognitive deficits. (*See Exhibit 2,* Fried Dep. at 9:18-10:1; 13:8-20; 25:4-29:21; *Exhibit 3,* Cohan Dep. at 47:9-16; 48:4-12; and *Exhibit 17,* Macedo Dep. at 13:21-14:9; 102:9-19; 104:7-105:12; 126:12-128:14). In addition, since the incident Plaintiff has suffered paranoid delusions of being followed by police officers (*See Exhibit 5,* Robinson Dep. at 232:1-233:21; 236:9-237:11; 135:10-136:21), as well as nightmares and recurrent, distressing flashbacks to the incident. (*See Exhibit 18,* Schwartzberg Dep. at 84:5-10). He is also plagued by headaches, confusion, memory loss, depression, and a sleeping disorder. (*See Exhibit 5,* Robinson Dep. at 270:14-18; and *Exhibit 17,* Macedo Dep. at 87:6; 110:16-18; 117:3-8; 118:11-20). As a result of these

conditions, Plaintiff is no longer able to mentally keep up with the tasks required for his job as an electrical technician at the Washington Metropolitan Transit Authority, and is unemployable in the work force. (*See Exhibit 5,* Robinson Dep. at 266:18-19; 270:7-12; 277:1-14; and *Exhibit 19,* Estelle Davis, Ph.D. Dep. at 70:12-78:21). The incident has also caused the Plaintiff to separate from his wife. His injuries have changed him – he is withdrawn, introverted, and has developed a psychotic state (*See Exhibit 19,* Schwartzberg Dep. at 85:5-7) – to such a degree as to cause her to be unable to deal with him. (*See Exhibit 5,* Robinson Dep. at 198:8-24; 287:7-14).

Defendants' use of excessive force, in addition causing Plaintiff grievous injury, has caused Plaintiff severe emotional distress. Therefore, Defendants' request for judgment on Plaintiff's intentional infliction of emotional distress claim must be denied.

### 9. Plaintiff is entitled to punitive damages, because Defendants acted with malice.

Maryland law allows punitive damages to be awarded on a showing that defendants acted with actual malice. *Scott v. Jenkins,* 345 Md. 21, 29 (1997). As set forth, *supra,* there is a genuine issue in dispute as to whether the Defendants acted with malice. Accordingly, the issue of punitive damages should go to the jury. *See supra,* Part III.B.1-B.4, B.7.

### V.    CONCLUSION

Because there are genuine issues of material facts in dispute in this case, Defendants' Motion for Summary Judgment must be denied.

Respectfully submitted,

CHAIKIN, SHERMAN,
CAMMARATA & SIEGEL, P.C.


/s/ JOSEPH CAMMARATA
Joseph Cammarata

/s/ ALLAN M. SIEGEL
Allan M. Siegel
The Law Building
1232 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 659-8600
F(202) 659-8680
siegel@ dc-law.net
Attorneys for Plaintiff


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of Plaintiff Joseph Robinson's Opposition to Defendants' Motion for Summary Judgment was served online, this 6th day of July, 2009 to:

Patricia P. Via, Esq.
Paul F. Leonard,Jr. Esq.
Patricia Lisehora Kane, Esq.
101 Monroe Street, 3rd Floor
Rockville, MD 20850

Steven B. Vinick, Esq.
Joseph, Greenwald & Laake
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770


/s/Allan M. Siegel/
Allan M. Siegel