IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------------x
                                    :
JOSEPH ROBINSON, et al.,            :
                                    :
            Plaintiffs,             :
                                    :
    v.                              :   Civil No. PJM 07-CV-0150
                                    :
MONTGOMERY COUNTY, MD, et al.,      :
                                    :
            Defendants.             :
                                    :
------------------------------------x

                                    Tuesday, October 14, 2008

                                    Rockville, Maryland

Deposition of

        JOHN G. PETERS, MBA, PH.D.,

witness, called for examination by counsel for the defendant, pursuant to notice, at the Office of the County Attorney, 101 Monroe Street, 3rd Floor, Rockville, Maryland 20850, beginning at 2:06 p.m., before James Chagetas, a notary public of the State of Maryland, when were present on behalf of the respective parties:

EXHIBIT 16

1  pass. But, we don't know because there's nothing in this
2  lesson plan that says what's minimum passing.
3      Q    So, you don't know what minimum passing was?
4      A    No.
5      Q    And, that causes you to conclude that the training
6  was inadequate?
7      A    Well --
8      MR. SIEGEL: Objection, mischaracterizes his
9  testimony. He's saying the lesson plan is inadequate based on
10 what's been provided.
11     THE WITNESS: The lesson plan is totally inadequate.
12     BY MR. LEONARD:
13     Q    So, you're saying that the lesson plan, in your
14 view, is inadequate?
15     A    Specifically, to your written ten question test.
16 Let me back up a minute. There's three areas of testing that
17 you do or you can do. One is called cognitive domain testing.
18 Cognitive domain testing is intellectual testing. This is
19 what high school teachers are taught when they go through
20 educational programs. Cognitive domain testing is written
21 testing. And, you would list under your performance
22 objectives each area that the student is going to be tested in
23 and what the passing score is. That's in the cognitive area.
24 The second area of testing is called affective domain. And,
25 affective domain generally is the personality of the student.

1  How well does the student follow directions?  Does the student
2  get angry?  Does the student hurt people intentionally during
3  training, those type of things.  And, then the third area is
4  called psychomotor domain testing.  So, there's three areas of
5  testing.
6       Now, if we don't have a subject that lends itself to
7  psychomotor domain testing, that subject area isn't taught or
8  tested on.  For example, if I'm teaching a course let's say on
9  criminal law, and here are the four elements of burglary, and
10 the five elements of larceny and whatever it happens to be,
11 there's no psychomotor domain testing there.  I mean, there's
12 nothing that you're going to go and demonstrate.  So, it has
13 to be only cognitive domain.
14    Q  Wouldn't the ten question written test be one way of
15 addressing the cognitive domain?
16    A  It would be.  You're right.  But, I haven't seen the
17 test questions.
18    Q  You just haven't seen it?
19    A  I haven't seen it.  I haven't seen anything in the
20 lesson plan that describes what those ten questions are.
21       MR. SIEGEL:  For the record, they haven't been
22 provided pursuant to any requests that the plaintiff --
23 pursuant to any of the plaintiff's requests.
24       BY MR. LEONARD:
25    Q  In item number four, which she described in her

1  deposition and I think you were referring to that portion of
2  her deposition where they actually do a physical enactment of
3  the skill and she rates it and gives them a certain number of
4  points, and tallies them up, and requires that it be a 70
5  percent rating or higher.
6     A    Correct.
7     Q    Wouldn't that be a method of testing psychomotor
8  skills?
9     A    Not as written.
10    Q    What about as implementing?  You heard how she
11 described it.
12    A    Okay, let me tell you how she implements it.  On
13 page 81 at line 15, or line 14 she was asked, what do they
14 need to pass?  And, this is the performance.  At line 15 she
15 says, 70 percent or higher.  At line 17 -- or, I'm sorry, at
16 line 16 she was asked, 70 percent of what?  And, she said 100.
17    Q    Didn't she say that she broke down individual
18 skills?  I mean, there's this 26 step process that they go
19 through, and broke it down into certain critical
20 sub-components.  And, out of a particular sub-component you
21 might get the maximum of five points or you might just three
22 points, etc.
23         MR. SIEGEL:  Objection.  It assumes facts not in
24 evidence.  I don't believe that accurately --
25         MR. LEONARD:  No, I'm referring to --

1           MR. SIEGEL:  Let me finish my objection.

2           MR. LEONARD:  Okay, I will.

3           MR. SIEGEL:  I don't believe that that accurately characterizes her description of the testing.  So, the hypothetical assumes facts not in evidence.

6           MR. LEONARD:  I'd appreciate if you didn't make speaking objections giving your opinion of your characterization.  But, I'll just --

9           BY MR. LEONARD:

10     Q    I think you understand the question.

11     A    Right.  On page 87, the question was asked, so do they get five points for doing each of the steps correctly?  Answer, yes.  Then on page 88 she says, if they were to say get on your knees when going through step five they would not get full credit for step five.  At line five she said they might get three instead of five.  Well, that's 60 percent.  That's not 70 percent.

18     Q    So, she made a computational error?

19     A    Well, she made the computational error because there's nothing in this performance lesson plan that says what the minimum passing score is.  There's no test document that I've been able to see that lists the specific steps the student must pass and which of those steps are terminal steps.  Because if you miss two of the steps that are terminal steps, the 60 percent doesn't fly.  It's an automatic zero.  So,

1   basically, what we have here is a document and an agency
2   historically that says you guys just go demonstrate it. And,
3   if I look at it, it'll be okay. And, if I don't look at it
4   because I missed something, that's okay too. Because we have
5   no testing. We talk about it but we have no formal testing.
6   And, this is the kind of stuff that got agencies in trouble in
7   the '70s and '80s primarily when female law enforcement
8   officers were getting kicked out of recruit academies for
9   arbitrary and capricious testing standards. And, these aren't
10  standards that I've come up with. These are standards that
11  are in the literature.
12       Q   Well, by her account she was having them do a
13  hands-on demonstration and evaluating them for passing or
14  failure, correct, on the 70 percent standard?
15       A   You're right. But, what's the 70 percent pass or
16  fail based on? That's what we don't know.
17       Q   And, because you don't know that you conclude that
18  it is inadequate?
19       A   Because I don't know that is because it's not in the
20  lesson plan and that's a requirement of lesson plan
21  development. And, I don't think this instructor had
22  instructional development that covered that. And, these are
23  pretty basic elements for lesson plan development.
24       Q   What do you mean instructional development?
25       A   In most states to teach a police subject the

1    Q    And, reasonable force could be applied in any number
2    of ways, is that correct?
3    A    I mean theoretically.
4    Q    It is theoretical stuff isn't it?
5    A    Well, some of it's theoretical I'll give you that.
6    But, what's not theoretical is instruction.  And, if you don't
7    teach it then it's no longer theoretical.
8    Q    Aren't there almost an infinite number of types of
9    application of force and potential injury that could occur in
10   requiring or making a suspect who is not compliant, compliant?
11   A    I don't think there's an infinite number or I should
12   say there is an infinite number.  I mean, you only get to a
13   point.  Your hypothetical is the officer by himself?  Are
14   there multiple officers?  What training did the officer have?
15   How big is the suspect?  What type of noncompliance?  I mean,
16   there's a lot of variables there that you really need to fill
17   in on.
18   Q    What is the list of all of the potential injuries
19   that could occur to a suspect if an officer uses force in
20   order to gain compliance?
21   A    For what type of force?
22   Q    Well, I'm asking you.  You focused in on this one.
23   What are all the others?  What should be in the lesson plan?
24   A    Well, what should be in this lesson plan, and I'm
25   only talking about prone, okay.  Your hypothetical was any

1  type of force. I'm only focusing on the prone. When you push
2  somebody forward, and this should be in the lesson plan, they
3  could strike their head on whatever the surface is. They
4  could hit their nose on the surface. You could injure their
5  neck. You could injure their back. They could injure their
6  chest. If they have their hands behind their back and you
7  push them forward and they can't get their hands out in front,
8  that can make the injury worse. Or, if their hands go down
9  and you push them so hard that they can't stop like a shock
10 absorber, that could cause it. I mean, those are the things
11 that are in the lesson plan that you point out to police
12 officers, particularly in this lesson plan because these are
13 candidates. They don't know the first foggy thing about law
14 enforcement. So, they're not going to know this stuff.
15 They're going to know what they saw on television. Television
16 is probably the greatest training aid people have prior to
17 coming to the police academy.
18     Q    In a prone handcuffing lesson plan what other uses
19 of force and potential injuries should be warned of other than
20 a push and a possible injury to the face?
21     A    Well, I think back injuries, shoulder injuries,
22 wrist injuries, finger injuries, chest injuries.
23     Q    From what use of force?
24     A    From pushing people forward.
25     Q    What other uses of force should be addressed and

1  other injuries associated with those uses of force?
2      A   Well, I guess other uses of force would be pushing
3  them backwards or grabbing their fingers and twisting it, or
4  going into a straight-arm takedown. I mean, a straight-arm
5  takedown or a bar-arm takedown. It comes by various names.
6  If you force them real fast you can break the elbow. You can
7  dislocate the shoulder. You can snap their head forward
8  causing a neck injury. I mean, we can spend a paramount of
9  time if we're going to go and combine the defensive tactics
10 portion with the prone handcuffing portion.
11     Q   So, all of these things should be in the prone
12 handcuffing --
13     A   All potential injuries should be in the prone
14 handcuffing lesson plan.
15     Q   All the potential uses of force and the physical
16 consequences on the subject should be in the prone handcuffing
17 lesson plan?
18     A   Well, not all uses of force because -- I mean, one
19 use of force is to shoot the guy in the back. I'm not sure
20 that should be in the prone handcuffing lesson plan. But, in
21 your hypothetical that would be a use of force. I'm talking
22 about use of force where the person is -- you're in that
23 kneeling position. That's what we're really talking about
24 here is the kneeling position. If they're already in the
25 prone position then we have to address things such as

```
1    transient compression.  We have to address things such as
2    potential wrist injuries or finger injuries or shoulder
3    injuries from bending arms or what have you.
4         Q    That should be in here?
5         A    That should be in here.
6         Q    The possibility that in a prone handcuffing if they
7    have to use force, if they bend the fingers that could hurt
8    the suspect in a certain way?
9         A    It could.  It doesn't mean that the officer is not
10   going to do it.  It just means that the instructor has pointed
11   out look, here's what can happen.  You know, if I've got a 60-
12   year old man on the ground and I'm going to hyper-extend his
13   wrist and get it off the back for thumping and I bend his
14   fingers back, I might break them.  I might break all of them.
15   I might break none of them.  But, you have to tell people,
16   look here's the potential injury.  It's a warning about the
17   technique.  That's really what it is.  It's a warning about
18   the technique and some of the problems that can come from it.
19        Q    And, that should be in the prone handcuffing lesson
20   plan?
21        A    That should be in that section of the lesson plan
22   going from kneeling to prone, absolutely.
23        Q    And, the possible physical effects on a suspect of
24   doing a straight-arm bar takedown should be in the prone
25   handcuffing lesson plan?
```

1    A    It's going to probably be in the defensive tactics
2 lesson plan. But, your restraint instructors have to know
3 what's being taught over on the defensive tactics side.
4 Because if we're going to use that straight-arm takedown to
5 get somebody into a prone position, he'll have to remind them
6 look, this could cause an injury.
7    Q    But, they may be getting that training over in
8 another block of their training?
9    A    They could be. But, it needs to be reminded here
10 that if you're going to use this technique to put somebody
11 down, recall from your defensive tactics training this could
12 happen. That's why this is a systemic issue. This is not --
13 we don't just write a lesson plan on one physical skill
14 without referencing all the other physical skills. It doesn't
15 make any sense to do that.
16    Q    In paragraph two of opinion number two you indicate
17 that Officer Mazuka said that he pushed Mr. Robinson in the
18 back with his hand and has pushed other people in a similar
19 manner, at least, 36 times.
20    A    Right.
21    Q    Where did he say that he pushed other people in a
22 similar manner 36 times?
23    A    I would have gotten it from his deposition I would
24 imagine.
25    Q    Do you have it?

1    A    That's what it appeared to me.  Let me get that
2    deposition.
3    Q    It appeared to you that that was on an
4    administrative violation?
5    A    Just give me one second, I'll find that.  On page
6    68, line 18 she was asked what's the commander's role --
7    Q    Who is she?
8    A    I'm sorry.  Melanie Eberly.  I'm sorry, that's my
9    mistake.  At line 18 she said the commander's role is to make
10   findings.  And, then line 19, 20 and 21 she was asked, would
11   that be the supervisor of the officer involved in the
12   complaint?  Line 22, it's not the direct supervisor.  He's in
13   that chain of command, yes.  And, then on page 69 at line 16
14   to 18, so the policy is to give it to the commander who's in
15   charge of the officer?  Answer, yes.
16   Q    And, what's your understanding of the role of the
17   internal affairs division and the investigations they do?
18   A    The investigator is simply a fact finder.  They
19   don't make decisions.  They don't make recommendations.  This
20   whole process is --
21   Q    And, what is your understanding of who the
22   decisionmaker is?
23   A    Well, the decisionmaker would be this commander that
24   she's referring to initially.  And, ultimately, if it's bad
25   enough I would imagine it would go before the chief or some

```
1    personnel board, hearing board, something.
2        Q    Is that appropriate?
3        A    Of course, that's appropriate if it's something that
4    -- well, say there's an officer who ran a red light, struck
5    some little kid on a bicycle, those decisions normally go to
6    the top.  I mean, they should.
7        Q    So, you're saying that if a complaint comes in on an
8    officer there ought to be clandestine surveillance on him?
9        A    No, I'm not saying that at all, counsel.
10       Q    Okay, maybe -- I'm not trying to put words in your
11   mouth.
12       A    Not at all.
13       Q    What do you mean --
14       A    What I'm saying is, let's go back to the
15   investigator's testimony.  This might say it best.  On page 29
16   of Ms. Eberly's testimony -- page 29, line 5, when she went
17   through the Department of Justice training she said they went
18   over an early warning system for police departments.  So, we
19   have now an investigator who has gone to department sanction
20   training that says you should have an early warning system.
21   And, that early warning system as used throughout the country
22   says you should have a database that if an officer pops up on
23   a complaint of excessive force more than X times, whatever X
24   is determined by the department -- three times in a quarter,
25   three times in six months or whatever the department says --
```

1  we're going to pull all those complaints and we're going to
2  look at them. We may not look at them for disciplinary
3  purposes, but we want to look at them and find out is this
4  righteous? Is this something that we should look at? And, if
5  it's something that contradicts policy, then we maybe need to
6  retrain the officer or we may need to redo our policy. That's
7  how these things usually are processed. Because sometimes the
8  actions are right and the policy is wrong.
9      Q   And, where is this standard set out?
10     A   International Association of Chiefs of Police has
11 that standard.
12     Q   In what?
13     A   Early warning systems and there are investigative
14 guidelines. The New Jersey attorney general's office it's a
15 mandate in New Jersey that this type of activity take place.
16 In administrative investigation books that are on the market,
17 same thing. The COLIA standards say that there should be a
18 procedure in place to detect these things. And, most of this
19 stuff came out of LAPD Rodney King incident.
20     Q   The Maryland Law Enforcement Officers Bill of Rights
21 says, and I think you quote a predecessor of the current
22 statute but I think the words are the same, that unless a
23 complaint was filed within 90 days after the alleged
24 brutality, an investigation that may lead to disciplinary
25 action under this subtitle may not be initiated and an action

1   may not be taken.  Is that correct?
2       A    Correct.
3       Q    And, Captain Falcinelli testified about that in his
4   deposition, correct?
5       A    Correct.
6       Q    His reading of that is that the department cannot
7   initiate an investigation that would lead to disciplinary
8   action involving brutality or excessive use of force.
9       A    Right.
10      Q    Unless a complaint is filed within 90 days of the
11  event.
12      A    Correct.
13      Q    Is that understanding correct?
14      A    That's his understanding obviously.  And, I think
15  one of the things that you failed to mention is that the
16  report has to be notarized.  I mean, that's what I've read
17  throughout these depositions is that the complainant has to
18  have that report notarized.  You're putting a heavy burden on
19  people.  The U.S. Department of Justice says that you take
20  complaints even anonymously and investigate them.  I
21  understand we have a statute here that Falcinelli interprets
22  the way he interprets it.  But, if we're going to just
23  whitewash everything and say look, it came in on the 95th day,
24  we're not going to do anything.
25      Q    But that's not what he did, is it?

1  So, the face is more than likely going to strike the surface
2  of whatever he's on and fairly hard.  If he's already
3  handcuffed there's no reason to push him forward.  You just
4  get him up and move him to wherever you're going to go.  And,
5  if he's handcuffed at that point, that would be in the
6  kneeling position so there was absolutely no reason to do
7  anything else.  You've accomplished the handcuffing objective.
8  You get him up and move him and take him wherever you're going
9  to go.
10      Q   So, if I understand your testimony correctly, even
11  if he was not handcuffed it's your opinion to a reasonable
12  degree of professional certainty that the actions of Mazuka
13  that day were excessive and likely to cause serious bodily
14  injury, correct?
15      A   Correct.
16          MR. LEONARD:  Objection.
17          BY MR. SIEGEL:
18      Q   The fact that he -- if he was, in fact, handcuffed
19  as Mr. Robinson described, that would make it even worse?
20      A   Absolutely.  That's way outside training and
21  generally accepted standards of defensive tactics or prisoner
22  transport or treatment.
23      Q   Officer Mazuka, and you reference this in your
24  report, testified that the prone handcuffing technique that is
25  taught is not performed on the street by officer.

1   A   Correct.

2   Q   Would you agree that the technique that the officers
3 used at the scene of this incident was consistent with Officer
4 Mazuka's statement that they're not doing it the way they're
5 taught?

6       MR. LEONARD:  Objection, leading.

7       THE WITNESS:  I would, that's correct.

8       BY MR. SIEGEL:

9   Q   Well, let me rephrase the question.  Is the
10 methodology that was used at the scene of the incident to the
11 prone handcuffing technique consistent or inconsistent with
12 the methodology which they are taught in the academy?

13  A   Inconsistent.

14  Q   What, if any, opinions do you have to a reasonable
15 degree of professional certainty as to the responsibility of
16 the supervising officer at the scene and/or the other officers
17 for that matter to ensure that it is done the way that it is
18 supposed to be done?

19  A   Well, I touched on this a little bit earlier.  You
20 have a cover officer present who is doing a number of things,
21 which generally is in violation of training.  The cover
22 officer does just one thing.  He provides cover.  Someone else
23 should be giving directions to the suspect.  The sergeant
24 should be there taking command presence, orchestrating that,
25 making sure everything is done.  And, if the sergeant sees

1  somebody coming from some other point view or if the suspect
2  without the person who's giving the commands or requesting
3  help, he should stop them and say that's enough; back up.
4  Now, depending on the circumstances usually in these types of
5  settings hand signals are used the most between officers.
6  It's not something that I would yell out and say to Mr.
7  Leonard because if the court reporter was a suspect then he'd
8  hear what was going on.  So, a lot of this is done with hand
9  communication.
10         But, if something is coming such as say an officer
11 running up to this person without being asked to do so, there
12 you would use a verbal command.  And, the sergeant should have
13 taken charge of that.  The sergeant should have said, look,
14 stop right there.  The sergeant also should have been
15 knowledgeable enough with the techniques that are used in this
16 setting, especially in high risk felony stops.  I mean, the
17 sergeant made the stop.  He's in command of that situation and
18 should be throughout the whole event.
19         BY MR. SIEGEL:
20    Q    Do you -- I'm sorry --
21    A    No, I was just going to say so the sergeant is
22 really responsible for everything that happens there.
23    Q    Do you have an opinion to a reasonable degree of
24 professional certainty as to whether or not the sergeant, in
25 particular Sergeant Patil's failures was a cause of the

```
1    incident occurring and the injuries that Mr. Robinson
2    suffered?
3         A    I do.
4         Q    How so?
5         A    The sergeant failed to take charge of the scene.
6    The sergeant failed to direct what was going on. Even to the
7    point of if someone else were giving the commands, the
8    sergeant -- the sergeant has worked with this special group
9    for a while. So, they should have actually done training on
10   this. They should have practiced high risk felony stops.
11   They should have practiced this type of event so all the team
12   members know what's going on. Therefore, he should have taken
13   charge of that and told people in training or in service
14   training or wherever this specialized training they were doing
15   took place look, here's how we're going to do it. We're not
16   going to deviate from it. There was no reason in my opinion
17   to push Mr. Robinson down because he said it's wet. He
18   complied with everything the officers asked him to do up to
19   that point.
20              If Mr. Robinson is right that he was handcuffed in
21   the kneeling position, then there was certainly no reason to
22   push him forward and Patil should have noted that, written it
23   up and sent it up the chain of command. If Mr. Robinson was
24   not handcuffed as the officers say, the same thing. There was
25   no reason to push him forward and put other officers directly
```

```
1    in the line of fire of the cover officer. It just makes no
2    sense. They're exposing everybody to dangers and the sergeant
3    is in charge of that. Not only should he have stopped it
4    then, but there should have been remedial training going on
5    right after that to say look, what you guys did tonight was
6    inherently dangerous and we're not going to do that anymore.
7         Q    Do you have an opinion as to whether or not the
8    actions by the other police officers on the scene was a cause
9    of the incident occurring and the injuries suffered by Mr.
10   Robinson?
11             MR. LEONARD: Objection; asked and answered.
12             THE WITNESS: Again, I think the other officers who
13   were there they should have diversified their task; the cover
14   officer is the cover officer. And, Mazuka and Wells shouldn't
15   have just ran up there. Now, I'm not quite sure -- I mean,
16   Wells I recall knelt on Mr. Robinson's back for handcuffing.
17   I think that's how you do that unless it's done in a vicious
18   manner.
19             BY MR. SIEGEL:
20        Q    Assuming he wasn't already handcuffed?
21        A    Right, assuming he wasn't already handcuffed.
22   Kenwood, I think, was outside the circle, if you will. He
23   didn't really see much. He was kind of out of that. But, the
24   other people, yes. You communicate back and forth. Nobody
25   asked Mazuka, based on my reading of the information, to run
```