## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOSEPH ROBINSON, *et ux.* | * | |
| | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | Civil Action No. PJM 07-CV-0150 |
| | * | |
| MONTGOMERY COUNTY, | * | |
| MARYLAND, *et al.* | * | |
| | * | |
| Defendants | * | |

## REPLY MEMORANDUM TO PLAINTIFF'S OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### (Revised to Comply with Page Limitation)

LEON RODRIGUEZ
COUNTY ATTORNEY

Patricia P. Via, Chief
Division of Litigation—Self-Insurance
Bar No. 04829

Paul F. Leonard, Jr.
Associate County Attorney
Bar No. 14781

Patricia Lischiora Kane
Associate County Attorney
Bar No. 13621

Attorneys for Defendants
101 Monroe Street, third floor
Rockville, Maryland 20850
(240) 777-6700

Filed:  September 11, 2009

## TABLE OF CONTENTS –REVISED REPLY MEMORANDUM

Page

I.    ARGUMENT....................................................................................1

      A.    Under Either Version of the Undisputed Facts, There Is No
            Evidence That the Officers Used Excessive Force....................1

      1.    Plaintiff's Account.........................................................1

      2.    The Officers' Account.....................................................3

            a.  Officers Cawood, Haak, Wells, and Sgt. Patil....................3

            b.  Officer Mazzuca ........................................................5

      3.    Plaintiff's Hypothetical Scenarios ...................................9

      B.    Defendants Are Entitled to Qualified Immunity........................11

      C.    Defendant Patil Is Not Liable to Plaintiff for the Actions
            or Omissions of His Subordinate Officers and Is
            Entitled to Judgment as a Matter of Law on Plaintiff's
            Fourth Amendment Supervisory Claim....................................12

      1.    Sgt. Patil did not have actual or constructive knowledge
            of any conduct that posed a pervasive and unreasonable
            risk of harm..................................................................12

      2.    There is no evidence that Sgt. Patil acted with deliberate
            indifference or tacit authorization of his officers' alleged
            unconstitutional conduct...............................................14

      3.    Sgt. Patil did not proximately cause the injury of which Plaintiff
            Robinson complains.......................................................16

      4.    Sgt. Patil did not fail to take control of the situation of which
            Plaintiff complains........................................................16

      D.    Montgomery County Does Not Have a Custom or Practice of
            Allowing Its Police Officers to Violate the Constitutional Rights of
            Suspects, Did Not Fail to Adequately Investigate Complaints of
            Excessive Force and Did Not Fail to Adequately Train Its Officers.......18

      1.    Plaintiff has failed to establish that Montgomery County had a
            custom or practice of allowing its police officers to violate the
            constitutional rights of suspects......................................18

|     | 2. | Montgomery County did not fail to investigate an excessive force complaint previously made against Sgt. Patil…………………………………………………………..19 |
| --- | --- | --- |
|     | 3. | Montgomery County's actions with regard to the present case do not establish any deliberate indifference on the part of the County..…………………………………………………….22 |
|     | 4. | Montgomery County did not fail to adequately train its police officers…………………………………………………….24 |

| II. | CONCLUSION…………………………………………………………………25 |
| --- | --- |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JOSEPH ROBINSON, *et ux.* | * |
| | * |
| Plaintiffs | * |
| | * |
| v. | *   Civil Action No. PJM 07-CV-0150 |
| | * |
| MONTGOMERY COUNTY, | * |
| MARYLAND, *et al.* | * |
| | * |
| Defendants | * |

## REPLY MEMORANDUM TO PLAINTIFF'S OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    ARGUMENT

#### A.    Under Either Version of the Undisputed Facts, There Is No Evidence That the Defendant Officers Used Excessive Force.

##### 1.    Plaintiff's Account

Defendants acknowledge that Plaintiff's somewhat fantastic account of how he was thrown to the ground conflicts with the testimony of the officers. However, Plaintiff's Opposition fails to address the critical defect in Plaintiff's testimony. Even if Plaintiff's testimony is accepted as true, Mr. Robinson is unable to attribute any specific conduct to a particular officer.

For purposes of this motion, Defendants are willing to posit those enumerated facts taken from Plaintiff's deposition testimony that are set forth in the Opposition. (Plaintiff Joseph Robinson's Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp."), pp. 4-5.) To summarize, Plaintiff states that he exited the vehicle as ordered, then turned around and walked backwards with his hands in the air. According to Plaintiff, one officer used an expletive as commands were given.[1]  Plaintiff was handcuffed behind his back in a standing position. Then an

---

[1]   This allegation is not material to the outcome of this motion, but will be assumed.

officer forcibly buckled Plaintiff's knees and he was picked up, hoisted over the officers' heads, and slammed head first into the pavement. (Pl. Opp., p. 5; Def. Ex. 12, pp. 133-35.)[2]

In his deposition, Plaintiff frankly admitted that he did not see any of the officers' faces and that he cannot attribute any specific conduct to Officers Cawood, Haak, Wells, or Mazzuca. (Def. Ex. 12, pp. 122-23, 126, 134.) In his Opposition, Plaintiff still does not dispute the point.

In order to prevail on a claim for damages for a constitutional violation pursuant to 42 U.S.C. § 1983, a plaintiff must establish that the defendant personally participated in the alleged violation. *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996); *Anela v. City of Wildwood*, 790 F.2d 1063, 1067-68 (3rd Cir. 1986). Where a group is involved, the plaintiff must demonstrate which individual "defendant violated a constitutional right." *McFadden v. Kennington*, No. 7:05-0284-HFF, 2008 U.S. Dist. LEXIS 3063 (D.S.C. Jan. 15, 2008). Under Plaintiff's version of the event, there is no disputing that this burden cannot be met. Therefore, all of the Defendants are entitled to summary judgment on the Fourth Amendment claim of excessive force if Plaintiff's account is postulated.

Although the above argument is dispositive of Plaintiff's version, it must be noted that Plaintiff's unlikely account also is discredited by the photograph of Mr. Robinson's face taken at the scene by Sgt. Patil. (Def. Ex. 14.) "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

---

[2] Unless otherwise noted, Defendants' exhibits previously attached to Defendants' Memorandum in Support of the Motion for Summary Judgment (Defendants' Memorandum) which are referred to herein are not attached to this Reply. These are identified as "Def. Ex. __" and the Court is referred to Defendants' Memorandum for these exhibits. Any exhibits attached hereto as Reply Exhibits ("Reply Ex. __") are either additional pages of previously supplied exhibits or new exhibits.

2

Considering the photograph, which shows no visible cuts, contusions, or outward signs of acute distress, no reasonable jury could conclude that Plaintiff was slammed face first onto the roadway from over six feet off the ground. Not only is Plaintiff unable to attest to personal involvement by the defendant officers, his account is flatly contradicted by the evidence and, therefore, does not withstand the motion for summary judgment.

## 2. The Officers' Account

The real issue is whether the officers' account, combined with the fact that Plaintiff apparently came away from the incident with a fractured zygomatic arch, is sufficient to create a dispute of material fact on whether any Defendant used excessive force. With respect to four of the officers, the answer is simple. It is undisputed that Officers Cawood, Haak, Wells, and Sgt. Patil, took no action whatsoever that is alleged to have caused injury to Plaintiff.

### a. Officers Cawood, Haak, Wells, and Sgt. Patil

The only testimony concerning Officer Cawood's role indicates that he performed a blocking maneuver with an unmarked vehicle and ordered Plaintiff out of the Dodge Caravan. (Def. Ex. 4, pp. 31-33, 36-37.) Officer Cawood then took a kneeling position in back of the car behind Plaintiff's, drew his weapon, and provided cover. (Def. Ex. 4, pp. 38-41.) Plaintiff's Opposition provides no contradictory testimony to dispute this account of Officer Cawood's role. It is undisputed that Officer Cawood had no physical contact with Plaintiff.

With respect to Officer Haak, the uncontroverted evidence is that he merely drew his gun and called out commands. The content of the commands is detailed in Defendants' Memorandum. *See* Memorandum of Grounds and Authorities in Support of Defendants' Motion for Summary Judgment ("Defendants' Memorandum"), pp. 19-20. The testimony as to Officer Haak's role is not disputed by Plaintiff, and it is clear that Officer Haak had no physical contact with Plaintiff.

3

Regarding Officer Wells, the undisputed testimony is that he placed a knee on Plaintiff's shoulder and took hold of a hand after Officer Mazzuca pushed Plaintiff forward. (Def. Ex. 5, pp. 84-85, 99-101.) In his Opposition, Plaintiff does not contend that these actions resulted in any injury to him. As a consequence, there are no facts, testimony, or even any contention, that would support a use of force claim against Officer Wells.

The same is true of Sgt. Patil to the extent any direct use of force claim is alleged against him.[3] By the time Sgt. Patil approached from the rear, Plaintiff was already on the ground, and the officers were getting him under control. (Def. Ex. 2, p. 5; Def. Ex. 1, p. 144.) Sgt. Patil never laid a hand on Mr. Robinson. He certainly cannot be said to have used excessive force.

As to these officers, Plaintiff makes a thinly supported argument that all should be jointly liable, even though none can be said to have physically harmed Plaintiff. The sole case cited in support of this argument is *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), *cert. denied* 480 U.S. 916 (1986). In *Grandstaff*, a group of officers discharged a firestorm of bullets, shooting and killing a man mistakenly believed to be a fugitive. All of the defendant officers were found jointly and severally liable under a wrongful death count, despite the fact that it was never determined whose bullet struck the decedent. The key difference between *Grandstaff* and the present case is that all of the officers in *Grandstaff* admitted to firing their weapons. *Grandstaff,* 767 F.2d at 166 and n.1. Here, there is no analogous conduct by the officers involved. Officers Cawood, Haak, Wells, and Sgt. Patil took no action that could have caused Plaintiff's alleged injury. As a result, *Grandstaff* is easily distinguishable and does not apply here.

In contrast, Defendants have cited a host of cases which hold that in order to prevail on a § 1983 claim, the plaintiff must show that each named defendant personally took action that violated the plaintiff's constitutional rights. (Defendants' Memorandum, pp. 27-29.) The weight

---

[3] The claim of supervisory liability against Sgt. Patil is addressed below in Section C.

of the legal authority mandates that Plaintiff's misplaced theory of group liability be rejected.

### b. Officer Mazzuca

The excessive force case boils down to the claim that "the push" by Officer Mazzuca violated Plaintiff's constitutional rights. It is here that the factors set out in *Graham v. Conner,* used to evaluate the objective reasonableness of an officer's conduct, come into play.

The first factor is the severity of the crime at issue. *Graham v. Conner*, 490 U.S. 386, 396 (1989). It is undisputed that the officers had a computer hit (through the National Crime Information Center system) for a stolen vehicle, causing them to initiate a "felony stop" of the vehicle. Suspected felons can be unpredictable. They sometimes flee or may carry a weapon. As a result, a high degree of caution must be exercised in making the arrest. Under the circumstances, the first factor under *Graham* weighs strongly in Defendants' favor.

The second factor is whether the suspect poses an immediate threat to the safety of the officers and others. Here, Plaintiff contends that there is a dispute of material fact. Mr. Robinson says he was compliant, and perhaps that is his perception. But what matters under Fourth Amendment analysis is the *officer's* perception at the time force is used. *Anderson v. Russell*, 247 F.3d 125, 130 (4th Cir. 2001). A number of the objective facts, which cannot be disputed, would have put any reasonable officer on guard. It is undisputed that Plaintiff was six feet three inches tall, and weighed approximately 210 pounds. He was wearing a long, puffy winter coat that could potentially conceal a weapon. (Def. Ex. 3, p.1.) In hindsight, it now is known that Plaintiff was not concealing a weapon, but Officer Mazzuca did not have the luxury of making that assumption. Furthermore, it was not known whether any additional persons were inside the van, so it was important to get the known suspect under control without delay.

5

Officer Mazzuca's perception was that Mr. Robinson was not compliant with the officers' commands, and experience had taught him that when suspects hesitate, they probably are thinking about either fighting or running. (Excerpts of Deposition of Officer Robert Mazzuca, Def. Ex. 11, p. 90.) Plaintiff was very slow to comply with Officer Haak's commands once he was ordered out of the vehicle. (Def. Ex. 11, pp. 92-93.) When Plaintiff eventually backed up, Officer Haak had to give him multiple commands before Plaintiff would get down on his knees. (Def. Ex. 8, pp. 120, 132-33.) Officer Mazzuca was directly behind Officer Haak when the commands were given, and took note of Plaintiff's delayed reaction. (Def. Ex. 11, p. 95.) Officer Mazzuca then heard Officer Haak order Plaintiff twice to get on the ground, producing no response. Officer Mazzuca himself then ordered Plaintiff three times to get on the ground, but still Plaintiff did not comply. (Def. Ex. 11, pp. 102, 106, 109-10.) Although Plaintiff denies it, Officer Mazzuca heard Mr. Robinson say something about the ground being wet. (Def. Ex. 11, pp. 91-93.) Due to the persistent non-compliance, Officer Mazzuca decided that it was time to put Plaintiff on the ground. (Def. Ex. 11, p. 109.) It was at that point that he gave Mr. Robinson what Officer Mazzuca describes as a moderate push to the shoulder area. (Def. Ex. 11, pp. 43-44, 114; Def. Ex. 9, p. 5.) Plaintiff's hands were in front of him and braced his fall, but Plaintiff went completely to the ground. (Def. Ex. 11, pp. 183-84, 187.) Once he was prone, Plaintiff was handcuffed behind his back. (Def. Ex. 9, p. 5.)

Viewing the totality of these circumstances, including Plaintiff's build, the puffy coat, the uncertainty as to the presence of accomplices, Plaintiff's slowness, and non-compliance, there was just cause for concern that Mr. Robinson could pose a threat. As a consequence, the second factor set out in *Graham* favors Defendants.

6

The third factor is whether the suspect was actively resisting arrest or attempting to evade arrest by flight.[4] At the outset of the stop, it was Officer Mazzuca's impression that Plaintiff attempted to ram his way out of the vehicle block by swerving to the left. (Reply Ex. 1, pp. 164-67.) This maneuver resulted in a minor collision between Plaintiff's vehicle and Officer Cawood's vehicle. Once Plaintiff was out of his vehicle and the commands were called, the resistance became more passive, but it was resistance nonetheless. The third factor under *Graham*, likewise, favors Defendants.

Finally, Plaintiff invokes the severity of the injury as an additional factor to be considered by the Court. Technically, it is not one of the factors listed in *Graham*, but it has been considered by some courts as part of the totality of the circumstances.

Plaintiff refers to the fractured zygomatic arch repeatedly, and would have the Court believe that the mere existence of the injury demonstrates a constitutional violation. That is not the case. To illustrate, there have been many cases in which the use of *deadly* force has been found to be reasonable. The mere fact that a suspect is killed does not mean that a constitutional violation has occurred. In other cases involving significant, but non-lethal, injuries the officer's conduct has been found to be constitutional. For example, in *Neiswonger v. Hennessey*, 89 F. Supp. 2d 766 (N.D. W.Va. 2000), previously cited by Defendants, a push that resulted in a fractured leg was found to be reasonable. In *McCaskill v. Yankalus*, No. 06-1739, 2007 U.S. App. LEXIS 17956 (4th Cir. Jul. 27, 2007), a push that resulted in a miscarriage was found to be reasonable.[5] These cases, and the cases cited by Plaintiff involving various injuries, demonstrate that a serious injury is

---

[4] On the evading and resisting arrest factor, Plaintiff criticizes two cases (*McKenagan v. Karnes* and *Greenidge v. Ruffin*) that Defendants did not even cite, as well as two cases (*Slattery v. Rizzo* and *Anderson v. Russell*) that Defendants cited for other legal propositions, unrelated to this factor. (Pl. Opp., p.14.)

[5] Plaintiff dismisses the *McCaskill* case because the plaintiff was pushed down onto a mattress, but ignores the fact that the suspect was pregnant and the result was a miscarriage.

7

neither a prerequisite to a § 1983 claim, nor does it establish a constitutional violation in and of

itself. In the final analysis, what matters is the reasonableness of the officer's conduct under the

totality of the circumstances at the time force is used.

To the extent it is considered, the fractured zygomatic arch must be viewed in context. Dr.

Fried testified that "mild to moderate" force could fracture the zygomatic arch bone. (Excerpts of

Deposition of David Fried, D.M.D., Reply Ex. 2, p. 10.)[6] Dr. Cohan noted that the zygomatic arch

is a thin, relatively weak bone, only a couple of millimeters in thickness. (Excerpts of Deposition

of Barry Cohan, D.D.S., Reply Ex. 3, pp. 48-49.) Furthermore, it is undisputed that Plaintiff had

periodontal disease, rampant caries, and numerous extractions prior to the incident. (Reply Ex. 3,

pp. 54-56; Excerpts of Deposition of Obadiah Peters, D.D.S., Reply Ex. 4, pp. 20-24 and Ex. 3

thereto.) The repair of the zygomatic arch by closed reduction required only a half inch incision in

which an instrument was slipped into the area of the fracture and the bone was literally popped

back into place. (Reply Ex. 3, pp. 58-59.) The procedure took about 10 minutes, and Plaintiff lost

about a teaspoon of blood. (Reply Ex. 3, p. 59.) Dr. Fried noted that Plaintiff had a tooth extracted

from the upper left within ten to twelve days prior to the incident and stated (albeit without medical

certainty) that the bone could have been in a weakened condition. (Reply Ex. 2, pp. 25-26.) Dr.

Fried further noted that contact with a flat surface ordinarily will not result in a fracture of the

zygomatic arch, and that the presence of a stone, pebble, or bottle cap is the type of thing that could

contribute to pressure on this thin rim of bone. (Reply Ex. 2, pp. 14-15.)

Lastly, the photograph of Plaintiff's face taken immediately after the incident belies

Plaintiff's argument that the claimed injury somehow proves that the officer acted improperly.

There are no visible cuts, abrasions, blood, or other indicia of excessive force, just a little debris on

---

[6] Dr. Cohan testified that "moderate" force could fracture a zygomatic arch. (Reply Ex. 3, pp. 49-50.)

the left ear. While the exact mechanism of the fracture may not be known, clearly it was not the
result of outrageous conduct by Officer Mazzuca.

On the whole, applying the factors of *Graham*, and considering Plaintiff's alleged injury,[7]
the totality of the circumstance demonstrate that Officer Mazzuca acted reasonably. The push that
Officer Mazzuca applied falls squarely within the proscription in *Graham* that not every push and
shove violates a suspect's constitutional rights. On the undisputed facts, there was no Fourth
Amendment violation.

### 3.    Plaintiff's Hypothetical Scenarios

Perhaps recognizing that under both Plaintiff's account and the officers' account
Defendants are entitled to summary judgment, Plaintiff consistently makes reference to scenarios
(or hypothesized sets of facts) that are not drawn from either Plaintiff's sworn testimony or the
testimony of any of the officers. This effort to manufacture a dispute of material fact by invoking
fact patterns that are not supported by the testimony should be rejected.

Specifically, Plaintiff makes repeated references to a scenario in which Mr. Robinson was
handcuffed behind his back and pushed to the ground from a kneeling position by Officer Mazzuca.
(Pl. Opp., p. 2, "Plaintiff was handcuffed at the time he was pushed by Officer Mazzuca"; p. 3,
"Mr. Robinson was handcuffed and then pushed to the ground"; p. 3, "he had been handcuffed
while he was either standing or kneeling and then slammed into the ground"; p. 6, "pushing
someone who is compliant and is already handcuffed is inappropriate"; p. 13, "both parties agree
that pushing someone who has been compliant and is already handcuffed is unnecessary.")[8]

---

[7]    It should be noted that Plaintiff's claims of brain damage, psychiatric sequelae, tempero-mandibular joint
dysfunction, disability from employment, and other damages claims are contested by Defendants and Defendants'
experts.

[8]    The case of *Jones v. Buchanan*, 325 F.3d 520 (4th Cir. 2003) (handcuffed suspect injured) has more to do with
Plaintiff's hypothetical scenario than the reality of what occurred in the present case.

9

Neither Plaintiff nor any of the officers state that Officer Mazzuca pushed Plaintiff to the ground from a kneeling position while he was handcuffed behind his back. That account is pure speculation. Likewise, there is no testimony that Plaintiff was handcuffed and pushed to the ground from a standing position. Indeed, the record is devoid of any testimony whatsoever that a "push" occurred while Plaintiff was handcuffed behind his back.[9] Plaintiff clearly states that, after he was handcuffed, he was lifted up bodily over the officers' heads and thrown to the pavement on his face. The officers make clear that the whole purpose of getting Mr. Robinson flat on the ground was to get him in a secure position *before* being handcuffed, and that is what occurred. Officer Mazzuca admits that he gave Plaintiff a push, but states that Mr. Robinson's hands were uncuffed and in front of him at the time. (Def. Ex. 11, pp. 183-84, 187.) Unsatisfied with the record as it exists, Plaintiff attempts to create a more favorable version of the facts to which no witness has testified.

A party cannot avoid summary judgment simply by theorizing some "plausible scenario" that supports the party's claims, when that proffered scenario conflicts with direct, contrary evidence. *See Swanson v. Leggett & Platt, Inc.*, 154 F.3d 730, 733 (7th Cir. 1998). Speculation is insufficient to withstand summary judgment, and the non-moving party must do more than merely suggest some metaphysical doubt as to the material facts. *Ortiz v. Butler*, 94 F.3d 1121, 1127 (7th Cir. 1996); *Jenkins v. Heintz*, 124 F.3d 824, 831 (7th Cir. 1997). Inferences cannot be drawn out of the air. It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Carter v. Butler*, No. 1:05-cv-01057 LJO DLB PC, 2009 U.S. Dist. LEXIS 59914

---

[9] Plaintiff cites to portions of the record where Defendants' liability expert (Samuel Wichner) and Sgt. Patil agree that pushing a suspect to the ground after he has been handcuffed behind his back is not appropriate. That has no bearing on the case because there is no testimony that it occurred.

(E.D. Cal. July 14, 2009).[10]

Here, Plaintiff seeks to distance himself from his own testimony by posing a hypothetical scenario that selects pieces of testimony from differing accounts that are incongruous with one another. This cafeteria-style approach to assembling a body of facts should not be permitted. Plaintiff has an account that must be considered in the light most favorable to him. The officers have an account that must be considered in the light most favorable to Plaintiff. But Plaintiff should not be allowed to manufacture a hypothetical scenario that is not backed up by any sworn testimony, solely for the purpose of avoiding summary judgment.

It is true that a jury would be free to believe all, part, or none of the testimony. However for purposes of this motion, a proffered scenario must be supported by sworn testimony. *See* Fed. R. Civ. P. 56(e)(2). Here, not one of the officers states that Plaintiff was handcuffed when Officer Mazzuca applied the push. And under Plaintiff's account, while Mr. Robinson was handcuffed, there was no push at all. Defendants submit that if there is to be a dispute of material fact, it should be based upon actual testimony, not excerpts from inconsistent accounts pieced together to form a fictitious hybrid.

## B.    **Defendants Are Entitled to Qualified Immunity**.

Plaintiff admits that "not every push and shove violates a suspect's constitutional rights." *Graham v. Conner,* 490 U.S. at 396. Here, the push, as described by Officer Mazzuca and the other officers, would not have violated any constitutional standard that should have been known to an objectively reasonable officer. The other officers did nothing that would have harmed Plaintiff.

---

[10]    This Court adheres to these principles. *See Venugopal v. Shire Laboratories*, 334 F. Supp. 2d 835, 840 (D. Md. 2004), *aff'd* 134 Fed. Appx. 627 (4th Cir. 2005) (a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences); *Jurgensen v. Albine Marine, Inc.*, 214 F. Supp. 2d 504, 510 (D. Md. 2002) (on summary judgment unsupported factual assertions will not be credited); *Diamond v. T. Rowe Price Associates, Inc.*, 852 F. Supp. 372, 389 (D. Md. 1994) (unsupported speculation is insufficient to defeat a motion for summary judgment).

In arguing against qualified immunity, Plaintiff again conjures up a scenario in which the push occurred while Plaintiff was handcuffed behind his back. (Pl. Opp., p. 22.) As stated above, there simply is no testimony to that effect. In the alternative, Plaintiff invokes his own account (Pl. Opp., p. 23), but he is not able to say that Officer Mazzuca or any Defendant had a role in lifting him up or throwing him to the ground.

Finally, Plaintiff reverts to his alleged injuries as grounds for denying the officers qualified immunity. Plaintiff cites to cases holding that a serious or permanent injury is not a prerequisite to a § 1983 claim, but ignores the corollary principle, that the mere presence of an injury does not establish a Fourth Amendment claim. The issue is one of reasonableness under the totality of the circumstances. As such, Officer Mazzuca and the other officers are entitled to qualified immunity.

## C. Defendant Patil Is Not Liable to Plaintiff for the Actions or Omissions of His Subordinate Officers and Is Entitled to Judgment as a Matter of Law on Plaintiff's Fourth Amendment Supervisory Claim.

Plaintiff argues that Sergeant Patil should be held accountable for any injuries inflicted by his subordinate officers. However, Plaintiff's arguments are without any factual or legal basis.

### 1. Sgt. Patil did not have actual or constructive knowledge of any conduct that posed a pervasive and unreasonable risk of harm.

Plaintiff argues that since Sgt. Patil and the officers he supervised did not follow a specific handcuffing procedure for prone handcuffing, then Sgt. Patil had actual knowledge that such action by his officers was a pervasive and unreasonable risk of harm to others. Plaintiff makes conclusory statements such as "[t]he failure to use these protocols was widespread within the SAT and Defendant Patil supervised, and subjected suspects to unreasonable risk of constitutional injury." (Pl. Opp., p. 24.) In his discussion of the guideline used to instruct entry level police officers on the method of prone handcuffing, Plaintiff conveniently selects specific sections of the training guideline, which provides a step-by-step instructional process, for teaching purposes. However,

12

Plaintiff completely ignores the fact that the training outline entitled *Handcuffing Prone Position—Outline*, which is attached as Exhibit 20 to Plaintiff's Opposition, is just that—an outline. Police officers always have discretion in the field to go hands-on when they believe it necessary, as was the case here.

There is no dispute that Montgomery County police officers, including the defendant police officers in this action, were given this training when they were in the police training academy. But significantly, Plaintiff ignores very specific testimony of Officer Shanda Berry, the officer who conducts the handcuffing training, with regard to how the process works and what the guideline means to officers who actually find themselves in a prone handcuffing situation with someone they believe is not complying or not responding. (Def. Ex. 18, pp. 39-40.) In fact, this step-by-step technique is a recommended technique, but it is not the only acceptable method of prone handcuffing a suspect. (Def. Ex. 18, p. 13.) Just because officers employed a different technique to prone a suspect does not mean the technique is inferior to the guideline process. An alternative technique may be the preferred method in a given situation. It most certainly does not equate to a constitutional violation.

What Plaintiff apparently does not understand, and what he conveniently ignores, is that when an officer believes that the suspect is not complying with an order, the officer need not go through the step-by-step process but must "go hands-on." (Def. Ex.18, p. 43.) One hands-on mechanism which Officer Berry described is an arm bar takedown which involves forcibly taking the suspect to the ground face down. (Def. Ex. 18, p. 43.) But what Officer Berry made clear is that in a prone handcuffing situation, "we ask someone to do something, then we tell them to do it" and when someone does not appear to be listening or complying, "then make them [do it]." (Def.

13

Ex. 18, p. 45.) This certainly conforms to what Officer Mazzuca said and did.[11]

Officer Mazzuca indicated that he was aware of the training protocol dealing with the specific call out of the instructions to a suspect to get on the ground but that his unit generally proned the suspect out by telling the person to get down on the ground and the person normally would do so. (Reply Ex.1, pp. 86-88.) There is nothing improper or unconstitutional about Officer Mazzuca's way of handling the proning out of a felony suspect. (Def. Ex. 11, pp. 86, 90-91; Def. Ex. 18, pp. 13, 43, 45, 63-64; Excerpts from Deposition of Samuel Wichner, Reply Ex. 5, p. 426.) And it is consistent with what Officer Berry indicated an officer could do, as noted above.

Plaintiff's entire argument concerning proof of a widespread and pervasive practice is that Sgt. Patil was aware that his officers' actions were subjecting suspects to unreasonable risk of constitutional injury. Plaintiff asserts that pushing a suspect to the ground "is likely to result in the suspect suffering injuries." (Pl. Opp., p. 25.) However, although Plaintiff makes such a conclusion, there are no facts in this case to support it. Most importantly, there is *absolutely no evidence* to establish that Officer Mazzuca or any other County police officer had engaged in conduct causing suspects to receive injuries as a result of being pushed to the ground.

The Fourth Circuit has recognized that it is "settled law" that a violation or a deviation from a departmental policy or procedure "does not equate with constitutional unreasonableness." *Abney v. Coe*, 493 F.3d 412, 419 (4th Cir. 2007) (citations omitted). There is simply no evidence in this case to show that officers were engaged in a widespread pattern of abuse that could lead to the particular constitutional injury that Plaintiff is claiming in this case or that Sgt. Patil had actual or constructive knowledge of any conduct that posed a pervasive and unreasonable risk of harm.

## 2.     There is no evidence that Sgt. Patil acted with deliberate indifference

---

[11]  Officer Berry noted that her teaching is a guideline, but the ultimate goal is to give directions to the suspect that are "as simple as possible." At any particular moment, the simple direction may be just to say "get flat on the ground," not to go through the step-by-step instruction of walking a suspect's hands out. (Def. Ex. 18, p. 69.)

14

**or tacit authorization of his officers' alleged unconstitutional conduct.**

Plaintiff argues that Sgt. Patil as a supervisor was deliberately indifferent because he failed to act "in the face of documented widespread abuses." (Pl. Opp., p. 26.) But Plaintiff fails to show what the "documented widespread abuses" are, other than to say that the SAT team officers do not use the step-by-step instruction to have a suspect walk his or her hands out when the officers are proning that suspect out.

Plaintiff cites to a case from the First Circuit as instructive of supervisor liability due to deliberate indifference. *See Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87 (1st Cir. 1994). The case, however, does not support Plaintiff's argument. Febus-Rodriquez, a mentally retarded man, was severely beaten and denied medical treatment by three police officers during his arrest for breaching the peace and performing indecent gestures. As a result of the beating, plaintiff became a quadriplegic and suffered from post-traumatic epilepsy and aphasia. Plaintiff and his mother brought constitutional claims against the officers and their supervisors, the latter for gross negligence in recruiting, training, and supervising the officers. Plaintiffs' expert testified that the supervisors were extremely lax in recruiting and hiring officers and had *no* training in crisis intervention, dealing with the mentally challenged, or even how to make a [non-violent] intervention or arrest. *Id.* at 90. Further, one of the officers had five complaints lodged against him. The First Circuit reversed the district court's denial of summary judgment for the supervisors, and granted them qualified immunity. The court found that plaintiffs had failed to show that the supervisors demonstrated the required callous or reckless indifference or that training standards were inferior.

In contrast, here, the SAT officers received extensive training, and there is no evidence whatsoever to establish that any of the officers in Sgt. Patil's unit have caused serious injury to

15

suspects during arrest and handcuffing situations, and there are no documented complaints relating to this type of conduct. There simply is no evidence that there were any widespread abuse, that any abuse caused the type of constitutional injury which Plaintiff is claiming in this case, or that Sgt. Patil was aware of or deliberately indifferent to the constitutional rights of others.

### 3. Sgt. Patil did not proximately cause the injury of which Plaintiff Robinson complains.

Without any proof of widespread abuse or pervasive risk of harm, Plaintiff makes a conclusory argument that Sgt. Patil failed to properly train, direct, and supervise his officers in the correct methodology for prone handcuffing, thereby creating an unreasonable risk of injury, the type of injury which Plaintiff sustained. As previously discussed, Sgt. Patil's unit was extensively trained in all aspects of handling felony suspects. The SAT officers did not violate departmental policy; they simply used an alternate method of instructing a suspect to get down on the ground. Any such deviation from a specific procedure or policy does not constitute a widespread abuse such that it amounts to a constitutional violation. *Abney v. Coe,* 493 F.3d at 419. As noted above, there is no evidence to establish that Sgt. Patil failed to act in the face of widespread and pervasive abuse of which he knew.

### 4. Sgt. Patil did not fail to take control of the situation of which Plaintiff complains.

Finally, Plaintiff complains that as the commanding officer in this case, Sgt. Patil had a duty to take control of the situation on the night in question and order the appropriate commands. However, Plaintiff has failed to provide any substantive legal support for his argument that Sgt. Patil had any obligation or duty to intervene under the facts of this case. Moreover, the evidence is such that there was no opportunity for him to intervene even if he should have.

In *Randall v. Prince George's County,* 302 F.3d 188 (4th Cir. 2002), the plaintiffs claimed a

16

violation under 42 U.S.C. § 1983 on the basis of bystander and supervisory liability against several police officers. The court indicated that under supervisory liability, the supervising officer has an obligation to insure that his subordinates act within the law. This theory is premised on a supervisor's notice of a subordinate officer's tendency to act outside of the law, and once he is on such notice, he must take steps to prevent the illegal activity. *Id.* Then, if the supervisor is deliberately indifferent by taking no action, he may be held liable. *Id.*

There is no evidence to support a claim of supervisory liability against Sgt. Patil based on the allegation of his failure to take control or act. As the undisputed facts reveal, at the time the call went out for the vehicle take-down to begin, Sgt. Patil's vehicle was toward the rear of the pack, in a position most distant from the suspect. (Def. Ex. 1, pp. 135-37; Def. Ex. 2, p. 5.) By the time Sgt. Patil got out of his vehicle and began to approach the suspect, the other officers were already dealing with Plaintiff. (Def. Ex. 1, p. 140.) In fact, by the time Sgt. Patil approached the immediate area where Plaintiff was located, Plaintiff was on the ground and the officers were getting him under control by handcuffing him. (Def. Ex. 1, p. 144.)

Defendants are not aware of any requirements, and Plaintiff has not cited to any legal authority, which provide that a supervisor take control of the scene if he is on the scene or that a supervisor must require his subordinate officers to wait until he arrives on the scene to take any action. As logic dictates, there is no such general obligation on the part of a supervisor because to impose such a requirement would be to thwart the progress of police action on a particular scene. Under the undisputed facts, Sgt. Patil had no opportunity to intervene because the events of which Plaintiff complains had occurred prior to Sgt. Patil arriving in a position to do anything. Moreover, as a supervisor, there is no evidence to support any argument that the officers acted outside the confines of the law or that Sgt. Patil was aware of any problems with any of his officers in their

17

treatment and handling of suspects in a felony stop.

    **D.**    **Montgomery County Does Not Have a Custom or Practice of Allowing Its Police Officers to Violate the Constitutional Rights of Suspects, Did Not Fail to Adequately Investigate Complaints of Excessive Force, and Did Not Fail to Adequately Train Its Officers.**

            **1.**    **Plaintiff has failed to establish that Montgomery County had a custom or practice of allowing its police officers to violate the constitutional rights of suspects.**

Plaintiff argues without any support that the SAT team's procedures are problematic and that the fact that the officers do not generally follow the prone handcuffing lesson plan is evidence that the County has some unconstitutional custom or practice allowing for the use of excessive force. Once again the law is well settled that deviations from departmental policies or procedures do not equate to a constitutional claim. *Abney v. Coe, supra,* at 419. Plaintiff argues that Sgt. Patil condoned non-compliance of the rules. Police work is dynamic and fluid, and officers are given a wide latitude of discretion to use when determining how to adapt to those evolving and changing circumstances.[12]

Plaintiff claims that the County has a widespread practice of its police officers disregarding regulations/guidelines and failing to use specific methodology, but provides no facts to support this conclusory allegation. Indeed, the only incident that Plaintiff can point to is the subject incident. The fact that Officer Mazzuca said he has had to go hands-on in other situations does not establish any "widespread practice" of improper conduct. The fact that the officers do not generally use the step-by-step process does not establish any "widespread practice" of improper conduct.

---

[12] In fact, the Supreme Court has recognized that police officers must adapt to evolving and changing situations. As previously noted, in *Graham v. Conner,* 490 U. S 386, 109 S. Ct 1865, 104 L. Ed. 2d 443 (1989), the Court recognized that real police work involves police officers having to "make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. And in this case, Officer Mazzuca made a split second decision, based on the circumstances that he perceived, that Mr. Robinson needed to be on the ground. Since Mr. Robinson was not complying after repeated requests to get on the ground, Officer Mazzuca took reasonable action to make him comply.

## 2.    Montgomery County did not fail to investigate an excessive force complaint previously made against Sgt. Patil.

Plaintiff argues that because there is evidence of a prior complaint of excessive use of force against Sgt. Patil and the County failed to discipline him in that prior matter, there is evidence of a policy or custom sufficient to impose municipal liability. Here again, Plaintiff's arguments are without merit.

First, it should be noted that while the cases cited by Plaintiff support the general proposition of the law in this area, they do not provide any guidance based on the facts of the instant case. Plaintiff cites to *Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995), where the Second Circuit found that there was a material issue of fact as to whether the City's systematic failure to monitor civil complaints against abusive officers after their return to active duty demonstrated deliberate indifference. The court noted that plaintiff presented evidence that the supervisory staff did not pay attention to the filing of complaints against officers, that the supervisory personnel who were responsible for monitoring officers' conduct were not informed of the civilian complaints, and that the monitoring function of the disciplinary process was understaffed. *Id.* at 1050. There is no factual comparison in the instant case.

Plaintiff also relies on *Beck v. City of Pittsburgh*, 89 F.3d 966 (3rd Cir. 1996). There, the Third Circuit reversed summary judgment where the lower court found insufficient evidence of a *Monell* claim alleging a custom or policy authorizing the use of excessive force. However, the evidence established that the officer who allegedly used excessive force in the underlying case had five complaints of excessive use of force in less than five years. *Id.* at 969-70. None of the complaints was sustained, and none of them resulted in any form of discipline. *Id.* at 970. Moreover, there was detailed evidence of the investigation conducted in each of the complaints and there were statistics regarding the use of force in the department. *Id.* at 969-70, 973. The court

19

noted that this was not a case involving "mere isolated events or mere statistics of the number of complaints." *Id.* at 973. On the contrary, the plaintiff offered as evidence a series of the actual written complaints that came to the department within a narrow time period, and this led the court to conclude that the plaintiff "presented sufficient evidence from which a reasonable jury could have inferred that the City of Pittsburgh knew about and acquiesced in a custom tolerating the tacit use of excessive force by its police officers." *Id.* at 976. The facts in *Beck* are a far cry from what is before this Court.

With regard to the prior complaint against Sgt. Patil, it is not "strikingly similar to the incident at issue," as alleged by Plaintiff. (Pl. Opp., p. 35.) The factual circumstances are as follows: On June 15, 2005, Sgt. Patil, along with a number of other police officers, was involved in an incident that occurred in Silver Spring where a suspect was taken into custody. A passerby, who admittedly had no knowledge of why police were at the scene, what the suspects were involved in, or what had transpired to cause the officers to arrest the individual, sent an e-mail to complain to the Director of Internal Affairs. (E-mail statement/complaint of Maggie Bauer, Reply Ex. 6.) Ms. Bauer did not identify any particular police officer but indicated that her concern was the amount of force used on the person who was arrested and the force "on the citizenry." (Reply Ex. 6.) Ms. Bauer indicated that she called the District Station and was referred to the internal affairs division. (Reply Ex. 6.) The matter assigned to Officer Melanie Eberly who conducted an investigation. (Deposition of Melanie Eberly, Reply Ex. 7, pp. 63-70.)

As part of her investigation, Officer Eberly attempted to obtain witness statements. She met with and interviewed both Mr. and Mrs. Bauer. (Reply Ex. 7, pp. 90, 103.) She also tried to interview another witness, Jane Freeman, who apparently had communicated with the commander of the first district station about the incident. However, Ms. Freeman refused to appear for an

20

interview with the investigator.[13]  (Reply Ex. 7, pp. 136-37).  Officer Eberly was denied the opportunity to question her, get more details about what she saw, get more information on the identity of the officers involved, and obtain any other relevant information.  (Reply Ex. 7, pp. 139-41.)  Thus, Officer Eberly did not include Ms. Freeman's statement in her summary of interviews.  (Reply Ex. 7, pp.77-80, 84-86, 136-37, 149-50.)  However, the notes of Ms. Freeman's statement were included in the investigative file which was reviewed through the chain of command.  (Reply Ex. 7, p. 136.)

Plaintiff also ignores the fact that another citizen, Robert Middleton, provided a written statement to Officer Eberly during her investigation in which he indicated that he believed the police officers' actions on the scene were "solid police work!"  It was his view that the police officers acted quickly, which contained and controlled the crowd in a proper manner.  (E-mail statement of Robert Middleton, dated June 28, 2005, Reply Ex. 8.)[14]

Although Plaintiff claims that this one incident somehow establishes that Montgomery County failed to investigate a prior excessive force complaint against Sgt. Patil, clearly, the matter was investigated and it went through a proper chain of command with the file going to the commander of the officers involved.  Plaintiff cannot dispute Sgt. Patil's exemplary record of 15 years on the police force.  (Excerpt from Deposition of Sgt. Dinesh Patil, Reply Ex. 9, p. 5.)  The one isolated complaint referenced by Plaintiff does not establish that he had "propensity for using excessive force."

---

[13]  Plaintiff complains that Ms. Freeman's statement was disregarded, but it, in fact, was not.  As Officer Eberly indicated, after she became aware that Ms. Freeman was a witness, she called Mr. Freeman and left a message indicating that Ms. Freeman needed to make an appointment for an interview.  However, Ms. Freeman refused to go to the police department for an interview.  Thus, Officer Eberly could not corroborate anything about what Ms. Freeman told the commander.  (Reply Ex. 7, p. 141.)

[14]  However, it should be noted that because Mr. Middleton did not give a personal interview, just like Ms. Freeman, Officer Eberly did not include a summary of his statement in her report, although his statement was contained in her file.  (Reply Ex. 7, pp. 134-35, 150-51.)

### 3.    Montgomery County's actions with regard to the present case do not establish any deliberate indifference on the part of the County.

Plaintiff argues that the County was deliberately indifferent because of its failure to investigate the allegations of excessive force against Plaintiff Robinson in the instant case. It is quite unbelievable that Plaintiff is making this argument since he was given every opportunity to request that the department investigate the matter, and despite the fact that he failed to comply with state law in terms of filing any excessive force complaint.[15]

On the night of this incident, Plaintiff was offered medical treatment, but refused to be taken to the hospital by the rescue squad. (Def. Ex. 2, p. 5.) Mr. Robinson left the scene on his own volition and drove himself in his own vehicle. He did not provide any correspondence or written complaint to the police department concerning the manner in which he was treated by the police on the night of the incident until, through his attorneys, he filed a Notice of Claim letter dated July 10, 2006. The Notice of Claim letter was addressed to the County Executive and pursuant to the Local Government Tort Claims Act, MD. CODE ANN., CT. & JUD. PROC., §5-301, *et seq.*, put the County on notice that Plaintiff intended to make a claim for monetary damages. (*See* Plaintiff's Exhibit 25, attached to Pl. Opp.) That notice letter was not for the purpose of having the police department conduct an internal investigation but was rather for the purpose of notifying the County of Plaintiff's intention to file a lawsuit. (Excerpts from the Deposition of David Falcinelli, Reply Ex. 10, p. 18.)

Plaintiff did not file any administrative complaint within the required 90-day time frame, and he did nothing else except to file this federal civil rights action. As Captain Falcinelli stated, when he received a copy of the Notice of Claim, he had one of his investigators prepare and send a

---

[15]   The Law Enforcement Officers' Bill of Rights (LEOBR), MD. CODE ANN., PUBLIC SAFETY, §§ 3-101 to 3-113, requires that an administrative complaint for excessive use of force against a police officer may not be investigated for disciplinary purposes unless a complainant submits a sworn complaint within 90 days after the alleged brutality occurred. § 3-104(c).

22

letter to Mr. Robinson's attorney explaining the complaint process and advising that the Notice of

Claim, to the extent that it was an administrative complaint, was submitted beyond the statutory 90-

day time limit. (Reply Ex. 10, pp. 18-21.) The letter also advised Mr. Robinson, through the very

counsel that are now making this argument, that he could pursue the matter for other violations by

filing a formal complaint, and the County would investigate for other administrative violations.

(Reply Ex. 10, p. 26, and letter to counsel from Captain Falcinelli dated August 25, 2006, Reply

Ex. 11.) However, neither Plaintiff nor his attorneys submitted anything concerning a desire to

pursue the matter. So when Mr. Robinson and his attorneys were given the opportunity to submit

the proper information to voice their concerns, they failed to do so. The fact that the police

department then did not initiate any independent investigation of this matter does not support any

claim for deliberate indifference on the part of the County.

Plaintiff cites to a Fifth Circuit case, *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir.

1985), claiming that it is similar to the instant case and arguing that "post-event evidence" is

permitted to establish deliberate indifference on the part of a municipality. The *Grandstaff* case has

*absolutely no application* to the present matter, and it is a case which has not enjoyed wide

application in the Fifth Circuit or any other circuit for that matter. *See Snyder v. Trepagnier*, 142

F.3d 791, 796-97 (5th Cir. 1998) (noting the high standard of proof demanded for imposing *Monell*

liability on a municipality).[16]

In the instant case, Plaintiff has failed to establish facts to warrant any application of

*Grandstaff.* Here, Plaintiff spoke with Sgt. Patil after the incident, refused medical transport to a

---

[16]    In *Snyder*, the court, citing to another Fifth Circuit case, distinguished *Grandstaff* recognizing " *'Grandstaff* affirmed a judgment against a Texas city on a highly peculiar set of facts. . . . The *Grandstaff* panel emphasized the extraordinary facts of the case, and its analysis can be applied only to equally extreme factual situations.' " *Snyder* at 797-98, quoting *Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986). *See also Stokes v. Bullins,* 844 F.2d 269 (5th Cir. 1988) (refusing to apply *Grandstaff).*

23

hospital, and drove himself from the scene. As the photograph taken of Plaintiff at the scene establishes, there was no immediate evidence of any injury or any blood, cuts, or abrasions. There was no immediate complaint to the County by Plaintiff. His Notice of Claim letter advising of his *intent to sue for money damages* came four months after the incident. And even though Plaintiff was told he could pursue the matter with IAD, he failed to do anything after being so informed. The alleged failure to investigate is simply insufficient to establish a *Monell* claim against Montgomery County.

### 4.    Montgomery County did not fail to adequately train its police officers.

Finally, Plaintiff makes one last ditch effort to establish a *Monell* claim by arguing that the County had inadequate training that amounted to "deliberate indifference" to the constitutional rights of persons with whom the police may come into contact. Plaintiff relies on the opinion of John G. Peters, Ph.D. and claims that Dr. Peters stated that the "lesson plans for prone handcuffing are inadequate." However, Dr. Peters conveniently ignored the trainer's testimony that she uses an evaluation system to review and check the officers' abilities. (Def. Ex. 20, pp. 51-58.)

Plaintiff takes issue with the County's arguments that Dr. Peters ignored the specialized training that the SAT team received by claiming that the County did not provide any documented training with regard to the SAT team on prone handcuffing. That is completely inaccurate. Defendants provided Plaintiff with training summaries of all the officers in this case which included basic SAT training, advance SAT training, and defensive tactics. At their depositions, the officers were asked about their training, and Plaintiff had access to their training summaries to inquire about the different training.

Plaintiff also takes issue with Defendants' characterization of Dr. Peter's testimony that he did not point to any particular standards when asked. This is, in fact, true as evidenced by his

24

deposition testimony. Dr. Peters could not specify how the County training in question was not consistent with nationally accepted standards. (Def. Ex. 20, pp. 62-63, Excerpts of Deposition of John Peters, Reply Ex. 12, p. 64.) There is no mischaracterization by Defendants as to what Dr. Peters said. He simply did not specify how the County's lesson plan, which was approved by the State Training Commission as it should have been, was inconsistent with any nationally-accepted standard. Dr. Peters' opinions do not meet the threshold to establish any *Monell* claim based on a failure to train. Moreover, there is simply no evidence to show that the County was on notice of some omission in training where there was an obvious need for additional training to prevent or avoid a violation of a citizen's constitutional rights.

## II.   CONCLUSION

Based upon the arguments presented herein, Defendants request that the Court grant their Motion for Summary Judgment, enter judgment in favor of Defendants and against Plaintiffs, and grant any other relief as to the Court deems just.

LEON RODRIGUEZ
COUNTY ATTORNEY

/s/

Patricia P. Via, Chief, Division of Litigation
Bar No. 04829 (signed by Paul F. Leonard, Jr. with the permission of Patricia P. Via)

/s/

Paul F. Leonard, Jr., Associate County Attorney
Bar No. 14781

/s/

Patricia L. Kane, Associate County Attorney
Bar No. 13621 (signed by Paul F. Leonard, Jr. with the permission of Patricia L. Kane)
Attorneys for Defendants
101 Monroe Street, third floor

Filed:  September 11, 2009

Rockville, Maryland  20850
(240) 777-6700

Reply to Opp-second revised